# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-01-00134-CV

---

**Universal Health Services, Inc.; RCW of Edmond, Inc.; Renaissance Women's Center of Austin L.L.C.; and Renaissance Women's Center of Austin, L.P., Appellant**

**v.**

**Margaret Thompson, M.D.; Linda Litzinger, M.D.; Donna Hurley, M.D.; Melanie Collins, M.D.; Sherry Neyman, M.D.; Laura Meritt, M.D.; Byron Darby, M.D.; and Renaissance Women's Group, P.A., Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. 99-14404, HONORABLE PAUL DAVIS, JUDGE PRESIDING

---

This contract dispute concerns an innovative concept for the delivery of women's healthcare services that disappointed its investors. The parties are a group of successful physicians who specialize in obstetrics and gynecology (the Physicians),[1] and a corporate investor in the health care field, Universal Health Services, Inc. and its subsidiaries (Universal). Together, the Physicians and Universal launched a project to combine physicians' offices and a hospital in one facility, to be known as the "Renaissance Women's Center." The Renaissance concept was designed to ease the traditional stresses and strains that accompany an OB/GYN's practice. No longer would an OB/GYN have to lose valuable time by going back and forth between her office to see regularly scheduled

---

[1] We will refer to the appellees collectively as "the Physicians" unless we need to refer to one physician individually.

patients, and area hospitals to deliver babies; the Renaissance Center offered her the time-saving convenience of seeing patients in her office upstairs and delivering babies in the hospital downstairs.

Under the parties' agreement, Universal owned the facility, operated the hospital, and leased the offices to the Physicians. While the Physicians profited from this arrangement, Universal's financial expectations for the Center were never realized; the hospital lost money and Universal decided to close the doors after two years of operation.

This appeal followed the Physicians' successful suit against Universal for breach of contract. Universal challenges the legal sufficiency of the evidence to support the jury's finding that the parties agreed in writing that Universal would keep the hospital open during the term of the Physicians' lease. We hold that the evidence is legally sufficient to support the judgment of the trial court.

**BACKGROUND**

In 1995, Mike and Frank Schuster approached Doctors Margaret Thompson and Linda Litzinger to discuss implementation of the Renaissance concept in Austin. Mike Schuster had developed a Renaissance facility in Oklahoma. Dr. Thompson became interested in the project after attending a presentation by Schuster and receiving a brochure advertising the Oklahoma facility. The cover of the brochure reads "A Rebirth in Women's Health Care" and describes the Renaissance concept:

> "Physicians have many resources, but the one resource that is severely curtailed for all physicians is time." The private practice OB physician typically operates out of a private office where they see patients in clinic for GYN medical needs, follow their OB patients during pregnancy, maintain their charts and records, and manage the patient accounting part of their practice. And, these physicians, spend a considerable

2

amount of their time and their life at local area hospitals delivering babies, handling complications which arise with their patients during pregnancy, and performing surgeries. . . . Anyone, especially women, who have been [sic] in an OB/GYN physician's office, knows that their daily activity involves scheduling patients to be seen in clinic, and then being called to leave their offices in the middle of the schedule to run to a local hospital for an imminent delivery.

As Dr. Thompson testified at trial, she identified with the brochure's description of the typical OB/GYN's lifestyle: hurried, harried, and demanding. Her frantic schedule had taken a toll on her personal life. It was with these problems in mind that she investigated the possibility of creating a Renaissance Center in Austin. She believed the Renaissance concept could ease the strains on her personal and professional life and after touring the Oklahoma Renaissance facility became confident that the concept could work in Austin. Although she and Litzinger had practices located elsewhere, they were won over by the anticipated advantages of moving to a Renaissance Center.

They decided to commit to creating the Renaissance Women's Center of Austin (the Center), which was patterned on the Oklahoma facility. In 1995, Thompson and Litzinger entered into a letter agreement (the "1995 Agreement") and a lease with Mike Schuster's company, Renaissance Centers for Women, Inc., memorializing their commitment to the contemplated Center. The parties agreed that the Physicians would lease the second floor of the proposed Center for a term of ten years with an option to renew for an additional five years.

Universal subsequently acquired Schuster's company, and Schuster informed the Physicians that they would be dealing with Dr. James Patton, an assistant vice president of Universal; the nature of the parties' agreement, however, was unchanged. In fact, Dr. Patton initialed and adopted the 1995 Agreement on Universal's behalf and also signed a second letter agreement (the

3

"1996 Agreement"), which approved the site for the facility.[2] Both Agreements described a joint project consisting of a women's hospital on the first floor with medical offices and a clinic on the second floor.[3]

The Physicians were involved in Universal's planning of the Center. They met with Dr. Patton regularly regarding the Center's opening. The Physicians signed a "Second Modification and Ratification of Lease Agreement" (the Ratification), in which they acknowledged that Universal had fulfilled various conditions contained in the 1995 Agreement and waived their right to terminate the lease.[4] Universal built a two-story building to house the facility and the Physicians began seeing patients there on September 7, 1997.

During the 27 months of the Center's operation, the Physicians experienced gains from the enhanced efficiency the facility offered; the Center, however, suffered serious financial losses, due in part to managed care companies' low reimbursement levels for women's medical procedures. The Physicians asserted at trial that Universal shared part of the blame for the Center's demise because of its poor management, inadequate financing, and poor marketing of the Center. In late 1999, Universal closed the hospital. The Physicians filed suit against Universal for breach of contract and fraud. They also sought a temporary injunction to prevent the closing of the Center pending

---

[2] Dr. Patton signed both agreements as a representative for RCW of Edmond, Inc. This entity is a subsidiary of Universal.

[3] The 1996 Agreement also assigned the interest of Renaissance Centers for Women, Inc. to a subsidiary of Universal, Renaissance Women's Center of Austin, L.P.

[4] The Ratification also acknowledged the change in the name of the Physicians' professional association to one consistent with the Center, and acknowledged the assignment of Renaissance Centers for Women Inc.'s interest under the lease in favor of Universal, specifically its subsidiary, Renaissance Women's Center of Austin, L.P.

4

resolution of this suit. *See Universal Health Serv., Inc. v. Thompson*, 24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.) (affirming trial court's order granting temporary injunction).

The case proceeded to a jury trial on the merits. The Physicians asserted that Universal had agreed in writing, specifically in the 1995 and 1996 Agreements and in the lease and Ratification, to keep the hospital open for the term of the Physicians' lease, or 15 years. Universal denied any such explicit agreement to keep the hospital open throughout the lease term.[5] The jury found that Universal had agreed in writing to maintain the hospital in operation for the term of the lease and awarded the Physicians $5,638,231 in actual damages, $4,000,000 of which represented net lost profits as a result of the closure. The jury also awarded $1,250,000 in attorney's fees to the Physicians.[6] On appeal, Universal raises a single issue by which it challenges the legal sufficiency of the evidence to support the jury's finding that the parties agreed in writing that Universal would maintain the hospital for the term of the lease.

## STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence supporting a jury's finding, we consider only the evidence and inferences that support the finding and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex. 1988). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *See Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987); *Komet v. Graves*, 40 S.W.3d 596, 600 (Tex.

---

[5] The charge asked the jury the following question: "Did the parties to the lease agreement and the letter agreements agree in writing that the owner of the Hospital would operate a women's hospital on the first floor of the Center for the entire term of the lease?" Answer: "Yes."

[6] The final judgment orders that the Physicians take nothing on their fraud claim.

5

App.—San Antonio 2001, no pet.). Universal has a heavy burden on appeal to reverse an adverse jury finding on legal sufficiency grounds. *See Brown v. Havard*, 593 S.W.2d 939, 942-43 (Tex. 1980) (stating that even with the existence of controverting evidence, the "record, when viewed under the 'no evidence' test, fully supports the [jury's] findings.").

## DISCUSSION

*Ambiguity*

Although Universal asserts that it has raised only the legal sufficiency of the evidence, it also challenges as a predicate matter the trial court's finding that the written agreements were ambiguous. Whether a contract is ambiguous is a question of law for the court to decide. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996). If the trial court rules that the contract is ambiguous, its meaning becomes an issue for the trier of fact. *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 131 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd). Universal frames its challenge to the legal sufficiency in the following manner:

> [T]here is only one issue for this Court's decision: whether legally sufficient evidence supports the jury's answer to Question No. 1. Because the written agreement cannot reasonably be construed to support the [Physicians'] theory that [Universal] made an absolute agreement to operate a hospital for the entire 15-year term of the Lease, the verdict is fatally infirm and judgment should be rendered in [Universal's] favor.

Both parties asked the trial court to rule in favor of its interpretation of the contract as a matter of law: the Physicians contended that the contract unambiguously required Universal to operate the hospital during the lease, while Universal maintained that the contract unambiguously failed to do so. The court found both interpretations reasonable but neither controlling as a matter

6

of law.  Consequently, it determined that the contract was ambiguous and submitted the meaning of the parties' agreement to the jury.  *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (if a contract is subject to two or more reasonable interpretations after applying the ordinary rules of contract construction, the contract is ambiguous).

Universal contends that the trial court erred in holding the contract ambiguous because the interpretation urged by the Physicians—that Universal agreed to operate a hospital for the entire term of their lease—is unreasonable.  Universal insists that the Physicians' interpretation obligates "the Hospital to remain operational for the entire 15-year term of the Lease, despite the fact that it was losing millions of dollars per year."  Similarly, Universal argues: "The [Physicians'] 'absolute' interpretation, which was incorporated into Question one, quite simply left the Hospital dangling in the wind, unable to cut its losses by closing, while the Group enjoyed its bird's nest on the ground."  Universal's argument, however, confuses contractual assumption of the *risk* of economic failure, which the Physicians contend Universal assumed, with economic failure itself.

Universal's argument would be more persuasive had the trial court granted specific performance requiring Universal to operate the hospital during the term of the lease.  Instead, the trial court denied the Physicians' request for specific performance and the hospital was closed.  Universal's argument that it never would have made the "absolute" agreement to keep the hospital open for 15 years regardless of the operating losses misses the mark.  Universal did not face the prospect of being required to keep the hospital open; but if it agreed to maintain the hospital as part of the Renaissance project, it did face the economic consequences of closing the hospital.  That was the issue submitted to the jury.

7

Universal complains that the Physicians have attempted to use extrinsic evidence to create an ambiguity. It cites *Forbau v. Aetna Life Insurance Co.*, 876 S.W.2d 132 (Tex. 1994), which stands for the proposition that an otherwise unambiguous contract cannot be made ambiguous merely because the parties offer conflicting interpretations. *Id.* at 134. The written agreements in the instant case, however, do not expressly preclude either parties' interpretation. Furthermore, the Physicians have advanced more than their unilateral expectation that the hospital would remain open throughout the lease. They have pointed to language in the written agreements that is susceptible to such an interpretation and to surrounding circumstances that reasonably suggest that both parties viewed their obligations as mutually dependent.

We reject Universal's contention that the agreement is unambiguous and find that the trial court correctly submitted its meaning to the jury. We next consider whether there is legally sufficient evidence to support the jury's verdict.

### Legal Sufficiency of the Evidence

In construing a written contract, the primary concern is to ascertain the true intentions of the parties as expressed in the written instrument. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). Because the trial court determined the contract was ambiguous, it appropriately instructed the jury to consider, in addition to the written terms, the parties' interpretations and other extrinsic evidence to ascertain the intent of the parties. *See id.; Cook Composites, Inc.*, 15 S.W.3d at 131.

The 1995 Agreement provides some evidence that both parties intended Universal to keep the hospital open as long as the Physicians were bound by their lease. The Agreement clearly

describes the parties' conceptualization of a facility that synthesized the Physicians' office practices and their hospital practices:

> [R]enaissance and Thompson and Litzinger contemplate participating in the project to be known as Renaissance Women's Center of Austin (the "Project") which will be composed of a women's hospital located on the first floor of the Project and medical offices and clinic leased to Thompson & Litzinger located on the second floor of the project.

The Physicians argue that this description captures the essence of the parties' agreement, which was to implement the Renaissance concept in a dual facility. The Physicians maintain that the parties had this concept in mind from the beginning of their business relationship; the fact that the parties found the concept significant enough to memorialize it in their first written agreement lends support to the Physicians' position. Furthermore, the Physicians emphasize the language of the agreement, which states that the project "*will be composed of a women's hospital* located on the first floor of the Project and medical offices and clinic leased to Thompson & Litzinger located on the second floor of the project. " (emphasis added). They maintain that the way in which the agreement is worded indicates that Universal's obligation to maintain the hospital for the term of the lease was mandatory, not permissive.

Universal contends that language in the preamble to an agreement or in a recital is not controlling. Recitals in a contract are not strictly a part of the contract unless it appears that the parties intended them to be such. *Illies v. Fitzgerald*, 11 Tex. 417, 424 (1854); *Gardner v. Smith*, 168 S.W.2d 278, 280 (Tex. Civ. App.—Beaumont 1942, no writ). We can look at recitals to ascertain the intent of the parties in executing the contract, especially where the contract's operative

terms are ambiguous. *See Gardner*, 168 S.W.2d at 280 (citing 17 C.J.S. *Contracts* § 314, p 733, now 17A C.J.S. *Contracts* § 317, p 340). Moreover, the quoted language forms a part of the contract, and we must examine all parts of the contract to determine the intent of the parties. *See Forbau*, 876 S.W.2d at 133. Nonetheless, Universal seizes on the word "contemplate" in the 1995 Agreement ("[R]enaissance and Thompson and Litzinger contemplate participating in the project . . . "), arguing that "contemplate" is not the equivalent of "agree." The trial court found that the contract was ambiguous, that the parties did not have an explicit agreement that Universal would keep the hospital open. The recital is, however, one of several indicia of the parties' intent to so agree.

Furthermore, the 1995 Agreement expressly states that it shall continue in effect and bind the parties "*throughout the term of the lease*." (emphasis added). The same paragraph goes on to state that the letter agreement would control the lease in the event the documents conflicted. This paragraph indicates that the parties deliberately structured the contract and the lease to reflect the parties' intention that their obligations under each would be mutually dependent. The parties expressly stated that the 1995 Agreement would govern the lease. They also explicitly provided that the 1995 Agreement was to be in effect for the same period of time as the lease. The fact that the parties structured their agreement in this manner is consistent with the Physicians' position, which is that while the written agreements do not expressly obligate Universal to keep the hospital open, the essence of the project was a facility that included an on-site hospital.

The parties also structured their agreement so that the Physicians became obligated on the lease only after Universal had demonstrated its commitment to building the Center. The 1995

10

Agreement expressly stated that the binding effect of the lease was subject to Universal's fulfillment of the following conditions: selecting an approved site for the facility, obtaining approval of plans and specifications for the design and construction of the facility, and substantially completing the facility. The jury could have considered this provision as further evidence that the Physicians' obligation under the lease was mutually dependent on Universal's obligation to maintain the facility, which included the hospital. Indeed, once Universal built the Center, the Physicians lost the right to terminate the lease.[7]

Universal contends that the provision means only that Universal was obligated to build the Center, not that it was required to keep the hospital open for 15 years. One other reasonable interpretation, as found by the jury, is that the parties understood that once Universal committed to building the Center, it would necessarily maintain the Center, including the hospital. As Universal concedes, everyone involved with the Center expected it to be successful; no one considered the possibility that the Center might fail. The contract expressly conditioned the Physicians' lease obligation on Universal's substantial completion of the dual facility. Given the nature of the Renaissance concept at the heart of the parties' agreement, the jury had some evidence to find that Universal was not free to unilaterally close the hospital after two years of operation.

The 1995 Agreement contains additional support for the Physicians' interpretation. Paragraph 5 states:

---

[7] The Ratification confirms that Universal had fulfilled the conditions in the 1995 Agreement and, therefore, that the Physicians waived their right to terminate the lease.

> Renaissance shall use reasonable efforts to obtain, and maintain in full force and effect *throughout the Term of the Lease, written agreements (the "Approved Hospital Agreements") certifying the Project as an approved hospital* by all health insurance companies, health maintenance organizations, health care plans or other health care benefit providers (the "Benefit Providers") for which Thompson & Litzinger or any of the physicians employed by Thompson & Litzinger are approved providers.

(emphasis added). As Dr. Thompson testified, this part of the contract required Universal to obtain and maintain contracts certifying the hospital with insurance companies so that services provided at the hospital were covered. While this paragraph addresses Universal's obligation to maintain such insurance agreements certifying the hospital throughout the term of the lease, there had to be a hospital throughout the term for there to be any need for insurance approvals. The jury could have extracted from this paragraph the reasonable inference that Universal would continue to operate the hospital for 15 years.

The 1996 Agreement also provides some evidence upholding the jury's finding. The document confirms the parties' understanding that they were embarking on a Renaissance project "which is to be composed of a woman's hospital to be located on the first floor of the Project, and medical offices and clinic leased to Thompson & Litzinger to be located on the second floor of the Project." The fact that the parties expressly described the Renaissance concept at the forefront of their second written agreement indicates that the parties bargained for a project with an on-site hospital. Moreover, the 1996 Agreement expressly confirms that the parties had, in fact, agreed in the earlier written agreement to jointly create a Renaissance center, thus removing any doubt that the parties had merely "contemplated" operation of the dual facility.

The 1996 Agreement, like the other documents, does not contain an express promise by Universal that it would operate the hospital throughout the lease. But when the several documents are considered as a whole, in light of extrinsic evidence, the true intent of the parties is apparent. *See Friendswood Dev. Co.*, 926 S.W.2d at 283 (stating that when a contract is ambiguous the factfinder may look to extrinsic evidence to ascertain the true intentions of the parties). Neither party envisioned offices or a clinic apart from a hospital. They intended that each constituent part—the hospital managed by Universal and the office space leased by the Physicians—would function as a whole; significantly, this is how they structured their written agreements.

Having found that the documentary evidence provides support for the jury's finding, we note that the jury also heard testimony that the increased efficiency offered to the Physicians by the Renaissance concept was the primary inducement for both parties to create and participate in the Center. Dr. Thompson testified that the on-site hospital is what attracted her to the project because it promised greater efficiency to all the Physicians. Universal's own business plan indicates that an underlying assumption of its investment in the Center was the increased efficiency expected to flow to the Physicians from the on-site hospital. The business plan emphasized the time-consuming nature of the conventional OB/GYN practice: "The most precious asset of a practicing physician is time, and the Center is designed to use the physician's time optimally." Universal promoted the efficiency of the Renaissance concept in its negotiations with the Physicians. Dr. Patton testified that he had discussed with the Physicians the time-saving aspect of the dual facility. The on-site hospital was the key to this anticipated efficiency. These mutual expectations provide some support for the finding that the parties intended for the hospital to be maintained for the term of the lease.

13

The Physicians also testified that they were motivated to participate in the project because of the confidence they had in the likelihood of its success with Universal's backing. In a brochure the Physicians introduced at trial, Universal markets itself as a health care leader, with powerful management resources and a significant market presence. The Physicians considered Universal to be a company with staying power, capable of making the investment the Center required. As evidence of their confidence in Universal, Drs. Thompson and Litzinger personally guaranteed the lease for over $4,000,000.[8]

Additionally, Dr. Thompson testified that she and Dr. Litzinger worked with Schuster in planning every part of the project, including the hospital. They decided they needed more physicians in the group to maximize the benefits of a practice at the Center, and so they recruited and hired several physicians to join their practice group. Moreover, the Physicians took out loans to facilitate their new practice at the Center. Dr. Thompson testified they incurred $1,400,000 in debt to recruit new physicians and to finish out the new office space. She also testified that she and Dr. Litzinger saw their lease of the office space in conjunction with the hospital; without the hospital, they had no reason to move their existing practices and assume this indebtedness. Dr. Thompson testified that it was important to them to structure the 1995 Agreement so that it defined the project—a hospital and a lease of office space—as "one deal." Therefore, the jury had before it extraneous evidence from which it could have inferred that the parties intended to have a hospital in operation throughout the lease term.

---

[8] Thompson and Litzinger personally guaranteed the rent for the first ten years of the lease. As the annual rent was about $432,000, the guaranteed amount was over $4,000,000.

14

## CONCLUSION

There is ample evidence in the record to support the jury's finding. Indeed, a review of the record makes plain that the basis of the parties' bargain was the Renaissance concept, which embodied a dual facility. Therefore, we overrule Universal's only issue and affirm the judgment below.

_____

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed:   November 29, 2001

Publish

15