John McMAHAN, Individually and d/b/a J.M. Wholesale, Appellant,

v.

Howard W. GREENWOOD, Howard Greenwood Investments, Inc., Fine Rides, Inc., Circular Processing, Inc., and J. Randle Henderson, Appellees.

No. 14–01–00431–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 29, 2003.

Rehearing Overruled May 29, 2003.

---

S. Loyd Neal, William T. Powell, Houston, for appellants.

David A. Carp, Michael C. Falick, Sydney N. Floyd, Houston, for appellees.

Panel consists of Justices SEYMORE, GUZMAN, and DRAUGHN.*

## OPINION ON REHEARING

EVA M. GUZMAN, Justice.

We withdraw our opinion of December 31, 2002 and issue this opinion on rehearing. The motions for rehearing filed by appellant McMahan and appellee Henderson are overruled.

John McMahan appeals from summary judgments granted in favor of Howard Greenwood, Howard Greenwood Investments, Inc., Fine Rides, Inc., Circular Processing, Inc. (collectively, "the Greenwood defendants"), and J. Randle Henderson in a lawsuit arising out of a business venture between McMahan and the Greenwood defendants. McMahan contends the trial court erred in granting the defendants' motions for summary judgment and in denying McMahan's motions for continuance and new trial. We affirm in part, reverse in part, and remand for further proceedings.

## I. Factual Background

John McMahan owned and operated a business refurbishing and selling antique and exotic automobiles. By early 1989, his inventory and equipment were under a lien securing a note held by the FDIC. In March of 1989, McMahan and Howard Greenwood began discussions for a business venture dealing in classic cars, which culminated in the formation of Fine Rides, Inc. in April of 1989. Greenwood was to provide financing and perform certain business functions, including financial management and accounting, while McMahan was to sell and service the cars and serve as company president. Although, initially Greenwood was to be the sole shareholder of Fine Rides, the parties signed a stock option agreement which provided that as part of his compensation, McMahan had an option to purchase 70% of the company's stock in exchange for his contribution of certain assets. The agreement provided that McMahan's stock option could be exercised at any time beginning April 1, 1989. Henderson, an attorney, drafted the incorporation documents and the Stock Option Agreement.

In order to free McMahan's assets from the FDIC lien, Fine Rides purchased McMahan's notes from the FDIC. Although McMahan contends he contributed approximately $750,000 in cash and assets to Fine Rides and that he was told by Henderson he was a shareholder, no stock certificates were ever issued to him. The summary judgment evidence reflected that the assets McMahan contributed to Fine Rides were originally recorded in the company's accounting records as contributions toward stock ownership, but were later "reversed" in March or April of 1991. The parties dispute who ordered the reversals and the reasons for the reversals.[1] In 1993, Fine Rides sold the service portion of its business to McMahan. As part of this transaction, McMahan purchased much of the inventory that he had earlier "contributed" to Fine Rides. The purchase price was incorporated into a promissory note for $173,356.53 from McMahan to Fine Rides, Inc.

---

* Senior Justice Joe L. Draughn sitting by assignment.

1. The Greenwood defendants contend McMahan himself ordered the reversals because of potential tax consequences. McMahan contends he did not become aware of the reversals until they were mentioned in a deposition in the present lawsuit.

By 1994, the business and personal relationships between McMahan and Greenwood had deteriorated significantly. On March 30, 1994, the parties entered into a settlement agreement to resolve "all matters between [the] parties including the division of assets, release of claims and/or liens against assets, the resolution of ownership of shares of stock in Fine Rides, Inc. and the resolution of any causes of action...." In the agreement, McMahan released any claim to stock ownership in Fine Rides in return for receiving certain property and rights. The agreement also contained the following language wherein each party agreed to release the other:

> from any and all claims, demands, damages, actions, causes of actions or suits in equity of whatsoever kind or nature whether heretofore or hereafter accruing or whether now known or not known to the parties for or because of any matter or thing done, omitted or suffered to be done by either of such parties prior to and including the date hereof and in any way directly or indirectly arising out of the business relationship between the parties.

In September of 1996, McMahan requested information from Henderson that would allow him to take tax credits related to losses he sustained in Fine Rides. In response, Henderson stated in a letter that McMahan had never owned any stock in Fine Rides and therefore was not entitled to an IRS Form K–1 from Fine Rides. McMahan claims he did not discover that he was not a shareholder until he received Henderson's letter. He further alleges he did not discover until August of 2000 that the accounting entries for the assets he had contributed to the company had been reversed in 1991. He contends the reversal essentially made the transfer of assets a loan from him to the company rather than a contribution toward stock ownership in accordance with the Stock Option Agreement.

McMahan filed suit against Henderson and the Greenwood defendants alleging fraud, fraudulent inducement, breach of fiduciary duty, breach of contract, conspiracy, conversion, concert of action and legal malpractice. He also pleaded duress and breach of conditions precedent. As damages for the alleged fraud, McMahan sought recovery of the contributions he claims were fraudulently obtained or the value of the tax credits he contends he would have been entitled to receive as a shareholder in the company. The defendants pleaded numerous affirmative defenses including release, ratification, and limitations. Henderson moved for summary judgment on both traditional and no-evidence grounds. The Greenwood defendants also filed a traditional and no-evidence summary judgment motion. Without specifying any grounds, the trial court granted summary judgments in favor of the Greenwood defendants and Henderson.

## II. Standards of Review

■ Because the court's summary judgment orders do not specify the ground or grounds upon which they were granted, we uphold the court's judgment if properly supported by any ground alleged in the motions. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). As noted, both motions for summary judgment alleged traditional and no-evidence grounds. Under a traditional ground for summary judgment, the movant has the burden of proving that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a; *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). A defendant as movant for summary judgment must conclusively negate at least one essential element of the plaintiff's cause of action or conclusively

establish each element of an affirmative defense. *Castillo v. Westwood Furniture, Inc.*, 25 S.W.3d 858, 860 (Tex.App.-Houston [14th Dist.] 2000, no pet.). If the movant's motion and summary judgment proof establish a right to judgment as a matter of law, the burden then shifts to the non-movant to raise a material fact issue sufficient to defeat summary judgment. *Id.* In deciding whether a disputed material fact issue precluding summary judgment exists, we resolve every reasonable inference in favor of the non-movant and all evidence favorable to him will be taken as true. *Nixon*, 690 S.W.2d at 548–49; *Castillo*, 25 S.W.3d at 860.

In a no-evidence summary judgment ground, the movant asserts that there is no evidence of one or more essential elements of claims upon which the opposing party would have the burden of proof at trial. Tex.R. Civ. P. 166a(i); *Lake Charles Harbor & Terminal Dist. v. Bd. of Trs. of the Galveston Wharves*, 62 S.W.3d 237, 241 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A no-evidence summary judgment should be sustained if: (1) there is a complete absence of proof of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 793 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706,

711 (Tex.1997). In reviewing a no-evidence summary judgment, we examine the evidence in the light most favorable to the nonmovant and disregard all evidence and inferences to the contrary. *Blan v. Ali*, 7 S.W.3d 741, 747 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

### III. The Greenwood Defendants

#### A. The Release

■ In their motion for summary judgment, the Greenwood defendants argued that the release language in the 1994 settlement agreement precludes all of McMahan's claims except for breach of the settlement agreement itself. A release, valid on its face, is, until set aside, a complete bar to any action based on matters covered in the release. *Deer Creek Ltd. v. N. Am. Mortgage Co.*, 792 S.W.2d 198, 201 (Tex.App.-Dallas 1990, no writ). In a summary judgment context, once a release is properly pleaded, the burden shifts to the other party to offer proof that the release should be set aside. *See Sweeney v. Taco Bell, Inc.*, 824 S.W.2d 289, 291 (Tex.App.-Fort Worth 1992, writ denied); *Deer Creek Ltd.*, 792 S.W.2d at 201. The Greenwood defendants asserted the affirmative defense of release based on the terms of the settlement agreement which, on its face, released all claims between the parties relating to stock ownership in Fine Rides.

In attempting to defeat application of the release, McMahan raised three grounds of avoidance: (1) rescission based on fraudulent inducement; (2) duress; and (3) a failure of conditions precedent. We examine each of these arguments in turn and conclude that McMahan has failed to meet his burden of proof.

#### 1. Fraudulent Inducement

■ McMahan first contends the settlement agreement should be rescinded or

voided because his consent was fraudulently induced. Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. *See Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex.2001). Fraud and fraudulent inducement require proof of a material misrepresentation that (1) was false; (2) was either known to be false when made or was asserted recklessly without knowledge of the truth and as an affirmative assertion; (3) was intended to be acted upon; (4) was relied upon; and (5) caused injury. *Fletcher v. Edwards,* 26 S.W.3d 66, 77 (Tex.App.-Waco 2000, pet. denied) (citing *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998)).

McMahan contends he was fraudulently induced to sign the agreement because (1) the Greenwood defendants represented to him that he was a shareholder in Fine Rides then failed to disclose that he was not in fact a shareholder before he signed the settlement agreement; and (2) the accounting entries showing he had contributed certain assets toward his stock option were reversed.[2] We discuss each in turn.

### a. Stock Ownership Representations

McMahan claims that appellees made fraudulent misrepresentations to induce him to contribute assets to Fine Rides. In exchange for his contributions, McMahan contends he was to receive 70% of the stock in Fine Rides, which he never received. McMahan further maintains he was told he was a shareholder of the company and that issuance of stock certificates was simply a formality. Regarding the settlement agreement, McMahan specifically argues that the Greenwood defendants failed to disclose their prior fraudu-

lent conduct, thus fraudulently inducing him to sign the agreement under the misimpression that he had been the majority shareholder.

In their motion for summary judgment, the Greenwood defendants argued that the summary judgment proof conclusively established McMahan knew he was not a shareholder of Fine Rides and, consequently, could not now claim that he relied on the alleged misrepresentations. McMahan's claim that he relied on the alleged misrepresentations cannot stand if he can be legally charged with knowledge of the true facts. *See Shindler v. Mid–Continent Life Ins. Co.,* 768 S.W.2d 331, 334 (Tex. App.-Houston [14th Dist.] 1989, *no writ*) (citing *Sutton v. Grogan Supply Co.,* 477 S.W.2d 930, 935 (Tex.Civ.App.-Texarkana 1972, no writ)).

The Greenwood defendants attached to their motion for summary judgment an affidavit from Henderson, the attorney who represented them in the negotiations culminating in the settlement agreement. In his affidavit, Henderson stated that during the settlement negotiations he told three different attorneys representing McMahan that it was the Greenwood defendants' position that McMahan was not a shareholder in Fine Rides, had never been a shareholder in Fine Rides, and was merely the owner of an unexercised stock option. Henderson further stated that McMahan's claim of stock ownership was definitely part of the negotiations and that one of McMahan's attorneys agreed to the language in the settlement agreement covering that issue, *i.e.,* "McMahan will release any claim he has to the ownership of stock of Fine Rides, Inc."

---

**2.** In his brief, McMahan includes a long list of allegedly fraudulent conduct; however, these two are the only specific claims he arguably articulates with respect to fraudulent induce- ment of the settlement agreement. Both claims are also related to his underlying fraud claim.

■ In response, McMahan argues that one of the attorneys listed by Henderson did not actually represent him because of a conflict of interest and that the statements in the affidavit do not prove McMahan had actual knowledge of the Greenwood defendants' position. We find these arguments without merit. The fact that one of the attorneys eventually declined representation does not harm the reliability of Henderson's affidavit. Further, the test is not simply whether McMahan had actual knowledge, but whether he could be charged with such knowledge as a matter of law. *See Shindler,* 768 S.W.2d at 334.

■ In determining whether McMahan can be charged with knowledge, we examine the reliability of the statements in Henderson's affidavit. Testimonial statements by an interested witness may be the basis for a summary judgment when the statements are clear, positive, and direct, are otherwise credible and free from contradiction and inconsistency, and could have been readily controverted. Tex.R. Civ. P. 166a(c); *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989).

We find the statements in Henderson's affidavit to be clear, positive, and direct. The statements include specific details as to the time, place, and subject matter of the conversations between Henderson and the attorneys representing McMahan. We also find the statements are otherwise credible and free from contradiction and inconsistency, particularly given that McMahan does not argue, and the record does not reflect, any express exercise of the stock option.[3] McMahan seems to be

of the opinion that the stock option was self-exercising once he made sufficient contributions, but nothing in the parties' contract or the record supports that position. Indeed, the Stock Option Agreement required the contribution of assets by McMahan "as shall be acceptable to the Company's Board of Directors." McMahan does not refer to any evidence in the record demonstrating the board's acceptance of his contributions. The statement in the settlement agreement that McMahan "will release any claim" further bolsters Henderson's averments. If McMahan was indeed considered a shareholder of Fine Rides then it would have been more logical to state that he released or conveyed his shareholder interests rather than stating that he "will release any claim" to stock ownership. Finally, we find Henderson's statements could have been readily controverted. McMahan could have provided affidavits from his former attorneys denying the alleged conversations, or stating that although the conversations occurred, the information was not conveyed to McMahan, assuming such statements were true.

■ Because Henderson's affidavit meets the requirements of Rule 166a(c) and McMahan has not controverted the statements in the affidavit, we find the summary judgment proof conclusively establishes that McMahan's attorneys were aware that he was not a shareholder of Fine Rides, had never been a shareholder of Fine Rides, and was merely the owner of an unexercised stock option. Knowledge acquired by an attorney during the

---

**3.** In his Motion for Rehearing, McMahan contends that the executed Buy–Sell Agreement evidences his exercise of the option. He reasons that because the Stock Option Agreement stated he would execute a Buy–Sell Agreement upon exercise of the option, and he did in fact execute a Buy–Sell Agreement, the record reflects his entitlement to the 700

shares of stock. However, both the Stock Option Agreement and the Buy–Sell Agreement were executed on April 1, 1989, and as McMahan has stated, he did not contribute the assets triggering the stock option until early 1990. Thus, the Buy–Sell Agreement executed in 1989 does not evidence his exercise of the option in 1990.

existence of an attorney-client relationship, and while acting in the scope of his or her authority, is imputed to the client. *See, e.g., Lehrer v. Zwernemann,* 14 S.W.3d 775, 778 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (imputing knowledge that mediator had prior dealings with opposing counsel); *Allied Res. Corp. v. Mo–Vac Serv. Co.,* 871 S.W.2d 773, 778 (Tex. App.-Corpus Christi 1994, writ denied) (imputing notice of hearing even though attorney withdrew at beginning of hearing). Accordingly, McMahan had imputed knowledge of the Greenwood defendants' position and was put on notice regarding the veracity of any alleged earlier statements regarding his stock ownership in Fine Rides. Therefore, as a matter of law, he cannot now claim he relied on the alleged misrepresentations. *See Shindler,* 768 S.W.2d at 334 (upholding summary judgment based on insured plaintiff's deemed knowledge of contents of insurance contract); *Coastal Corp. v. Atl. Richfield Co.,* 852 S.W.2d 714, 721 (Tex.App.-Corpus Christi 1993, no writ) (stating that buyer could not continue to negotiate in reliance on statements after learning of fraud); *Camden Mach. & Tool, Inc. v. Cascade Co.,* 870 S.W.2d 304, 311 (Tex. App.-Fort Worth 1993, no writ) (holding that when party's investigation reveals falsity, party cannot, as a matter of law, be said to have relied upon misrepresentations of another).

#### b. The Accounting Reversals

McMahan also argues that he was fraudulently induced to sign the settlement agreement because of the defendants' failure to disclose the reversal of certain accounting entries. McMahan bases his arguments on his affidavit and the deposition testimony of Cynthia Williamson, Fine Rides' treasurer and bookkeeper. Williamson testified she made accounting entries demonstrating that McMahan contributed certain assets toward fulfilling the requirements of his stock option. She also testified she later reversed the entries, and admitted that the assets then no longer appeared on the books as contributions toward the stock option. McMahan contends the reversals transformed the contributions into something more in the nature of loans from himself to the company rather than an exercise of his stock option. He states in his affidavit that he learned for the first time at Williamson's deposition that the alleged contributions had been reversed, but at no point does he state he was ever told about the original accounting entries.[4] The accounting records themselves, which were apparently used as exhibits in the deposition, do not appear in the appellate record.

■ As discussed above, we find that, prior to signing the settlement agreement, McMahan had imputed knowledge of the Greenwood defendants' position that he was not a shareholder, had never been a shareholder, and was merely the owner of an unexercised option. This imputed knowledge was sufficient to put McMahan on notice at the time he signed the settlement agreement that his contributions had not purchased 70% of Fine Rides as he claims to have been led to believe. The accounting reversals do not change the fact that McMahan knew the Greenwood defendants' position regarding his shareholder status in Fine Rides when he signed the settlement agreement. Furthermore, the accounting reversals do not constitute a separate act of fraud, particularly given that McMahan does not claim

---

4. Williamson testified she made the reversals at McMahan's direction. This testimony is supported by the testimony of Howard Greenwood, and by that of John Eagleson, Fine Rides' accountant.

he was ever informed about the entries. In sum, McMahan signed the settlement agreement with, at a minimum, imputed knowledge that his contributions had not entitled him to stock ownership. Accordingly, we find McMahan has failed to meet his burden of proof that the release should be set aside based on fraudulent inducement. *See Sweeney,* 824 S.W.2d at 291; *Deer Creek Ltd.,* 792 S.W.2d at 201.

### 2. Duress

McMahan next argues that the settlement agreement is void because it was the product of duress. Specifically, he contends the Greenwood defendants forced him into signing the agreement by: (1) filing a forcible entry and detainer action and obtaining a default judgment; (2) having armed guards follow him while he was on the Fine Rides premises; (3) failing to pay $20,000 that they owed him; and (4) telling him, falsely and groundlessly, that criminal charges were being pursued against him. McMahan claims these actions interfered with his ability to transact business and placed him in a compromised financial situation such that he had no other choice but to sign the settlement agreement.

As a matter of law, there can be no claim of duress unless the following elements are present: (1) a threat or action was taken without legal justification; (2) the threat or action was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the opposing party's free will and caused it to do that which it would not otherwise have done and was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection. *Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429, 443 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

McMahan first contends the Greenwood defendants pursued a premature and wrongful forcible entry and detainer action against him. However, the threat to institute a civil suit or even the actual institution of a suit does not, as a matter of law, constitute duress. *Cont'l Cas. Co. v. Huizar,* 740 S.W.2d 429, 430 (Tex.1987); *Executive Condos., Inc. v. State,* 764 S.W.2d 899, 903 (Tex.App.-Corpus Christi 1989, writ. denied). The rule remains in force even if the person threatened does not have the financial wherewithal to defend against the suit. *Dannelley v. Bard,* 62 S.W.2d 301, 308–309 (Tex. Civ.App.-Beaumont 1933, writ ref'd). In the present case, McMahan claims the Greenwood defendants acknowledged the wrongfulness of the forcible entry and detainer action because the settlement agreement states the judgment in the action was "entered in error." Even assuming this statement is an admission that the action itself was wrongful, it does not convert the institution of the suit into the kind of imminent restraint necessary to prove duress. *See Cont'l Cas. Co.,* 740 S.W.2d at 430. McMahan was adequately protected in the courts. *See Matthews v. Matthews,* 725 S.W.2d 275, 278 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). That he failed to protect himself and a default judgment was entered against him likewise does not convert the filing of the suit into evidence of duress.

McMahan next argues that having armed guards trail him at the Fine Rides premises constituted duress. In support of this argument, McMahan cites only to his own affidavit and to exhibits attached to his motion for new trial. The attachments to the motion for new trial were not before the trial court when it granted summary judgment and, hence, we will not consider them on appeal of that judgment. *See Medlock v. Comm'n for*

*Lawyer Discipline,* 24 S.W.3d 865, 871 (Tex.App.-Texarkana 2000, no pet.); *Laurel v. Herschap,* 5 S.W.3d 799, 802 (Tex. App.-San Antonio 1999, no pet.). Regarding the armed guards, McMahan's affidavit states "[a]t or about the time of the forcible entry and detainer suit, I began to be followed at the Fine Rides, Inc. workplace by armed guards when I was attempting to interact with employees and conduct business with customers of Fine Rides, Inc." Contrary to the suggestion in McMahan's brief, this statement does not support the conclusion that he was "effectively precluded from being able to service customers and earn a living." The quoted language from the brief regarding the ability to earn a living appears to be a mere summation of several pieces of information that McMahan alleges caused him distress. He does not contend that the presence of the armed guards alone was sufficient to create actionable duress. Indeed, in his affidavit McMahan specifically states that "a restraining order [caused him] to be unable to work." In his deposition, McMahan explained that by "restraining order" he meant the result of the detainer action. At most, the statement about armed guards creates no more than a mere surmise or suspicion of duress and constitutes no evidence. *See Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 210 n. 42 (Tex.2002) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.").

■ McMahan's contention that the Greenwood defendants owed him $20,000 and that Henderson, on behalf of the Greenwood defendants, threatened to bring criminal charges against him were not set forth in his responses to the motions for summary judgment. Conse-

quently, we cannot consider those claims in reviewing the validity of the summary judgment. *See Leinen v. Buffington's Bayou City Serv. Co.,* 824 S.W.2d 682, 685 (Tex.App.-Houston [14th Dist.] 1992, no writ) (holding that plaintiff could not raise fraud issue on appeal when had not done so in pleadings or in response to motion for summary judgment). Additionally, the only citations given by McMahan in support of these claims are to the proof attached to his motion for new trial. As stated above, we do not consider such proof in reviewing a grant of summary judgment. *See Medlock,* 24 S.W.3d at 871; *Laurel,* 5 S.W.3d at 802. Accordingly, we hold there is no evidence in the summary judgment record to raise a fact issue concerning duress.

### 3. Conditions Precedent

McMahan also contends the settlement agreement is unenforceable because of the failure of conditions precedent contained in the document. According to McMahan, the settlement agreement was conditioned on the Greenwood defendants' release of all UCC encumbrances and liens within ten days from the date of the agreement, the transfer of Fine Rides' telephone number to McMahan upon the cessation of business, and the dismissal of the detainer action. McMahan argues that none of these conditions precedent were fulfilled and, consequently, the agreement (and particularly the release) never came into effect.

McMahan's arguments regarding conditions precedent are based on certain language in the second paragraph of the agreement. Although McMahan relies only on the last sentence of the following excerpt, the entire paragraph is included here for context:

The intent of this Agreement is to resolve all matters between parties includ-

ing the division of assets, release of claims and/or liens against assets, the resolution of ownership of shares of stock in Fine Rides, Inc. and the resolution of any causes of action whether by tort, contract, statutory or otherwise. Upon the fulfillment of the obligations and promises under this Agreement the parties [sic] intent is a total separation of ways and no causes of action or claims to assets of the other will exist.

Absent ambiguity, a court must construe the meaning of a contract as a matter of law. *Chapman v. Hootman,* 999 S.W.2d 118, 122–23 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Conditions precedent are acts or events that occur subsequent to the formation of a contract and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty. *Marsh v. Marsh,* 949 S.W.2d 734, 743–44 (Tex.App.-Houston [14th Dist.] 1997, no pet.). In order to determine whether a condition precedent exists, the intention of the parties must be ascertained, and that can be done only by looking at the entire contract. *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). Normally, in order to create a condition precedent, an agreement must use a term such as "on condition that," "if," "provided that," or some similar conditional phrase. *Id.; Cal–Tex Lumber Co. v. Owens Handle Co.,* 989 S.W.2d 802, 809 (Tex.App.-Tyler 1999, no pet.). Conditions precedent are not favored in the law, and courts tend to construe contract provisions as covenants rather than as conditions. *Criswell,* 792 S.W.2d at 948; *Marsh,* 949 S.W.2d at 744.

In response to McMahan's contention regarding conditions precedent, the Greenwood defendants argue the language is merely a recital of the goal to be reached through entering into the contract. We agree. A "recital" is "[t]he formal statement or setting forth of some matter of fact, in any deed or writing, in order to explain the reasons upon which the transaction is founded." BLACK'S LAW DICTIONARY 1270 (6th ed.1990); *see Universal Health Servs., Inc. v. Thompson,* 63 S.W.3d 537, 543 (Tex.App.-Austin 2001, pet. granted) ("We can look at recitals to ascertain the intent of the parties in executing the contract, especially where the contract's operative terms are ambiguous."); *see also AFD Fund v. Midland Mgmt.,* No. Civ.A. 3:02CV0055–D, 2002 WL 731813, at *6–7 (N.D.Tex. Apr. 22, 2002) (holding that recital could not be read as enlarging unambiguous terms of agreement). The language cited by McMahan speaks to the intent of the parties in executing the contract and in fulfilling the covenants under the contract to effectuate a total business separation. This language cannot convert covenants under the contract into conditions precedent.

We further note that the cited language does not contain any phrases expressly conditioning performance of the agreement. Instead, the section states "[u]pon the fulfillment of the obligations and promises under this agreement...." The reference to "obligations and promises" is especially probative of an intent to create covenants rather than conditions precedent because a condition precedent is something that must exist before a duty of immediate performance of a promise arises. *See, e.g., Ins. Corp. of Am. v. Webster,* 906 S.W.2d 77, 81 (Tex.App.-Houston [1st Dist.] 1995, writ. denied). Failure to satisfy a condition precedent generally results in no liability, but failure to perform a contractual obligation may create liability. *See Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992). The use of the phrase "obligations and prom-

ises," therefore, does not indicate the creation of conditions precedent.

We find that the language relied on by McMahan is a mere recital of the parties' intentions in entering into the contract and that the alleged conditions precedent are simply covenants under the contract. Accordingly, the trial court did not err in granting summary judgment against McMahan's claims of conditions precedent.

## B. Breach of Contract

 McMahan does not argue that any of his claims would be spared from operation of the release if the release were determined to be valid. However, his breach of contract claim was apparently for breach of the settlement agreement itself; thus, the release could not preclude that claim. Even so, neither McMahan's response to the Greenwood defendants' motion for summary judgment nor his appellate brief do anything more than mention the breach of contract claim. Accordingly, by failing to present evidence in the trial court, McMahan has waived his claim. Moreover, by failing to present argument or authority on appeal, he has waived his argument on appeal. *See Cuyler v. Minns*, 60 S.W.3d 209, 216 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (plaintiff waived claims on appeal by offering no argument or authority to avoid summary judgment); *Dagley*, 18 S.W.3d at 793 (no-evidence summary judgment is proper when there is complete absence of proof of a vital fact).

## C. Conclusion

In conclusion, we find the release contained in the settlement agreement signed

by McMahan is valid and effectively precludes McMahan's underlying claims against the Greenwood defendants. Consequently, we need not review his additional arguments concerning alternative grounds for summary judgment, and affirm the trial court's summary judgment in favor of the Greenwood defendants.

## IV. Henderson's Summary Judgment Motion

 McMahan contends the trial court erred in granting Henderson's summary judgment motion. In his motion, Henderson alleged both traditional and no-evidence grounds.[5] We address: (1) Henderson's claim that he was covered by the release; (2) Henderson's contention that all of McMahan's causes of action are barred by the statute of limitations; (3) Henderson's various no-evidence grounds; and (4) his objections to McMahan's affidavit. Finding that some of McMahan's claims should have survived summary judgment, we affirm the judgment in part, reverse in part, and remand for further proceedings.

## A. Waived and Abandoned Claims

 In his reply brief, McMahan states that his petition raised causes of action against Henderson for fraud, fraudulent inducement, "negligence/legal malpractice," breach of fiduciary duty, conversion, conspiracy, and concert of action. McMahan has failed to do more than reference his conversion or concert of action claims, either in his response to Henderson's summary judgment motion or in his appellate brief. Accordingly, we find these claims have been waived by a

---

**5.** When it ruled on Henderson's motion for summary judgment, the trial court did not have before it the affidavit Henderson attached in conjunction with the later-filed Greenwood defendants' motion for summary judgment. Accordingly, on appeal, we cannot consider the statements in that affidavit because it was filed as summary judgment evidence only with the Greenwood defendants' motion. *See Medlock*, 24 S.W.3d at 871.

failure to argue them in the trial court and on appeal. *See Cuyler,* 60 S.W.3d at 216; *Dagley,* 18 S.W.3d at 793.[6]

## B. The Release

■ Henderson argued in his motion for summary judgment that the release language in the settlement agreement precludes any claims McMahan might have against him. It is well settled in Texas that a release covers only those people it names or otherwise specifically identifies. *McMillen v. Klingensmith,* 467 S.W.2d 193, 196 (Tex.1971). To be effective, the identification must be with such descriptive particularity that the person's identity or his connection with events is not in doubt. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 420 (Tex.1984). Under the heading "Mutual Release," the settlement agreement between the parties provided as follows:

> NOW, THEREFORE, for and in consideration of the mutual promises and covenants above and for other and good and valuable consideration each of the parties above named for his predecessor, successor, assigns, heirs, executors, administrators and legal representatives, *release and forever discharge [sic] the other and his predecessor, successors, assigns, executors, administrators and legal representatives* of and from any and all claims, demands, damages, actions, causes of actions or suits in equity of whatsoever kind or nature whether heretofore or hereafter accruing or whether now known or not known to the parties for or because of any matter or thing done, omitted or suffered or to be done by either of such parties prior to and including the date hereof and in any

way directly or indirectly arising out of the business relationship between the parties. (emphasis added)

McMahan maintains the settlement agreement did not specifically identify Henderson as a protected party. Henderson argues he was specifically identified by the term "legal representatives." In his motion for rehearing, Henderson argues that the plain, ordinary meaning of the term "legal representatives" includes an attorney at law. Indeed, he argues that it is a "simple fact" and there is "no question" the term "legal representatives" is synonymous with "attorney." Thus, we must decide whether the term "legal representatives" as used by the parties in the settlement agreement included Henderson.

■ We begin our analysis by noting that a release is a contract. *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990). In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Century Bass Club v. Millender,* 949 S.W.2d 841, 844 (Tex.App.-Waco 1997, pet. denied). Language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would be thereby defeated. *Id.* at 844–45.

### 1. The Meaning of "Legal Representatives"

The interpretation of the term "legal representatives" is a familiar task to appel-

---

**6.** Henderson also attacked a breach of contract claim in his motion, but McMahan did not include such a claim in his list nor did he make any arguments regarding it in his brief.

Consequently, to the extent there was such a cause of action raised in the pleadings, it has been abandoned on appeal. *See Cuyler,* 60 S.W.3d at 216.

late courts. *Caudle v. Eckles,* 282 Ky. 295, 138 S.W.2d 468, 469 (1940). In the past, Texas courts have grappled with the meaning of the term, although we find no Texas case in which the issue at hand was squarely decided. *See Allen v. Stovall,* 94 Tex. 618, 63 S.W. 863, 865 (1901) (construing the statutory term "legal representatives" to include heirs at law); *Commercial Standard Ins. Co. v. Herrin,* 515 S.W.2d 163, 166 (Tex.Civ.App.-Eastland 1974, no writ) (finding that the surviving widow of the named insured is a "legal representative" under insurance policy); *Knoff v. United States Fid. & Guar. Co.,* 447 S.W.2d 497, 501 (Tex.Civ.App.-Houston [1st Dist.] 1969, no writ) (finding the term "legal representatives" in a fire insurance policy was not used in a "technical sense" and thus included "successors in interest in the real property insured").

■■■ Thus, we are called upon to interpret the meaning of the phrase "legal representatives" as used by the parties in the release. At common law, when there is nothing in the context to control its meaning, its primary and ordinary meaning is "executors and administrators." *See Briggs v. Walker,* 171 U.S. 466, 471, 19 S.Ct. 1, 43 L.Ed. 243 (1898); *see also Averbuck v. Stoller,* 4 Mass.App.Ct. 791, 344 N.E.2d 198, 199 (1976) ("The words 'legal representative' naturally connote [one's] executors."). Though Henderson neither cites to nor relies upon cases to this effect, there is ample jurisprudence for the common law definition of the term.[7]

7. *See Woolsey v. Nationwide Ins. Co.,* 884 F.2d 381, 384 (8th Cir.1989) (noting "the terms 'personal representative' and 'legal representative' generally mean the executor or administrator of a deceased person"); *Reed v. American–German Nat'l Bank,* 155 F. 233, 236 (C.C.W.D.Ky.1907) (noting that "[t]he terms 'legal representative' and 'personal representative,' in their commonly accepted sense, mean administrator or executor" although its usage may also include "heirs, next of kin, or descendants, and sometimes assignees or grantees."); *Young v. Firemen's Ins. Co. of Washington, D.C.,* 463 A.2d 675, 676 (D.C. 1983) (noting that "[i]t appears to be uniformly held that where the language or the circumstances surrounding the parties thereto do not indicate a different intention, the term 'legal representative' must be given its primary legal meaning of executor or administrator."); *Pullen v. Cincinnati Ins. Co.,* 400 So.2d 393, 401 (Ala.1981) ("The term 'legal representative' is one having a well-defined legal meaning, its 'primary meaning' being executors or administrators."); *Hill v. James,* 252 Miss. 501, 175 So.2d 176, 179 (1965) ("Either of these preceding words, 'administrator' or 'executor' refers to the legal representative of an estate, and though the method of appointment as to each might differ, one by law and the other by will, each signifies a representative capacity as distinguished from an individual capacity."); *Lewis v. King,* 165 Ga. 705, 141 S.E. 909, 910 (1928) (noting

"[t]he power conferred upon the 'legal representative' of the grantee should be construed as conference of power upon an executor or administrator of the grantee."); *Conley v. Jamison,* 205 Iowa 1326, 219 N.W. 485, 486 (Iowa 1928) ("The great weight of authority we have found on this subject defines the phrase 'legal representatives' as ordinarily meaning executors or administrators when not qualified by the context" and that "the numerous cases that [the court] investigated on this question are the following which seem with one voice to hold that the phrase 'lawful representatives' is limited to executors and administrators."); *Larkins v. Routson,* 115 Ohio St. 639, 155 N.E. 227, 230 (1927) (noting that "research of the authorities as to the definition of the phrase 'legal representatives' discloses a number of meanings, such as, administrators or executors, assignee or grantee, trustee"); *Page v. Metro. Life Ins. Co.,* 98 Ark. 340, 135 S.W. 911, 912 (1911) (noting that when the term legal representative is used in "any legal instrument" without any other context, the "well recognized" meaning executor or administrator should be applied.); *Kelsay v. Eaton,* 45 Or. 70, 76 P. 770, 772 (1904) (noting that "[t]he phrase 'legal representatives' in its ordinary acceptation means executors and administrators" although it might include "heirs, next of kin, or descendants"); *Sullivan v. Louisville & N.R. Co.,* 128 Ala. 77, 30 So. 528, 533–34 (1901) (noting that the term "legal representative" has a

More generally, Black's Law Dictionary defines the term as "one who stands in place of, and represents the interests, of another" and provides as examples the executor of an estate and the court appointed guardian of a minor. BLACK'S LAW DICTIONARY 896 (6th ed.1990).[8] Black's also explains that the term is generally considered synonymous with "personal representative." *Id.; see also Unsatisfied Claim & Judgment Fund v. Hamilton,* 256 Md. 56, 259 A.2d 303, 306 (1969) (noting the term legal representative is "almost always held to be synonymous" with the term personal representative); *Missouri ex rel. Emmons v. Hollenbeck,* 394 S.W.2d 82, 86 (Mo.Ct.App.1965) (noting the statutory term "personal representative" was synonymous with "legal representative which is a generic term denoting an administrator or executor of a deceased person").

■■■ Although the term has "no fixed and unyielding meaning in law," it reaches "only those individuals who are in a position tantamount to that of party or whose legal rights were otherwise so intimately bound up with parties that their rights were directly affected by final judgment." *In re El Paso Refinery, LP,* 37 F.3d 230, 234 (5th Cir.1994) (quoting *Kem Mfg. Corp. v. Wilder,* 817 F.2d 1517, 1520 (11th Cir.1987)). Texas case law suggests a "legal representative" is one who is a party substitute or one who can sue on another's behalf. *See Clark v. Turner,* 505 S.W.2d 941, 948 (Tex.Civ.App.-Amarillo 1974, no writ) (noting that upon death of a party, the legal representative is substituted as party plaintiff or defendant); *see also Estate of Pollack v. McMurrey,* 858 S.W.2d 388, 390 n. 2 (Tex.1993) (noting "the decedent's answer in an original action inures to the benefit of his legal representative" (the personal representatives of the estate) and prevents rendition of a valid default judgment for failure to file an answer); *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 515–16 (Tex.App.-Fort Worth 2001, pet. denied) (discussing the ability of legal representatives to sue or be sued under Survival Statute, TEX. CIV. PRAC. & REM.CODE ANN. § 71.021); *Phifer v. Nacogdoches County Cent. Appraisal Dist.,* 45 S.W.3d

"well-defined legal meaning" and that its "primary meaning" was executor or administrator); *Allen v. Stovall,* 94 Tex. 618, 63 S.W. 863, 865 (1901) ("The signification of the word ['representative'] is broad enough to embrace both executors and administrators—the personal representatives, as known to the common law—and also the heir, who, under that law, occupied the place of the ancestor as to the real estate, and represented him as to such property."); *Griswold v. Sawyer,* 125 N.Y. 411, 26 N.E. 464, 465 (1891) ("It is undoubtedly true that the strict, technical *prima facie* meaning of [the phrase 'legal representatives'] is administrators or executors, and that they must always have that meaning, unless it can be seen that they were used in a different sense.") (emphasis in original); *Cox v. Curwen,* 118 Mass. 198, 200 (Mass.1875) ("It is admitted that the ordinary meaning of the words 'legal representatives' is 'executors and administrators.' "); *Warnecke v. Lembca,* 71 Ill. 91 (Ill.1873) ("Legal representative, or personal representative, in the commonly accepted sense, means administrator or executor" but "may mean heirs, next of kin or descendants.").

**8.** Courts often rely upon the persuasive authority of Black's Law Dictionary in statutory or contract construction. *See, e.g., Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health and Human Res.,* 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (relying on the Black's Law Dictionary definition of the statutory term "prevailing party"). We are not the first court to rely upon Black's Law Dictionary to interpret the term "legal representative." *See, e.g., Agae v. United States,* 125 F.Supp.2d 1243, 1248 (D.Haw.2000); *Forbes v. Am. Int'l. Ins. Co.,* 260 Md. 181, 271 A.2d 684, 686–87 (1970); *Wills v. De Kalb Area Ret. Ctr.,* 175 Ill.App.3d 833, 125 Ill.Dec. 657, 530 N.E.2d 1066, 1070 (1988).

159, 172 (Tex.App.-Tyler 2000, pet. denied) (discussing the defense of a suit by a legal representative under Tex.R. Civ. P. 152 after the death of the defendant). Plainly, the preceding authority suggests the term "legal representative" refers to one who succeeds to a party's legal rights, by reason of death, or the operation of law.

## 2. Recent Authority

Nevertheless, Henderson insists that to adopt an interpretation contrary to his would be to ignore "the irrefutable fact that attorneys and courts throughout this country ... consistently and without hesitation, use the term 'legal representative' to refer to the party's attorney." In support of his argument, Henderson directs our attention to two related cases from our court. In *Cramer v. Piro,* the wife in a divorce action sued her husband's attorney. No. 14-95-00572-CV, 1995 WL 688869, at *1 (Tex.App.-Houston [14th Dist.] Nov. 22, 1995, writ denied) (not designated for publication). Both parties to the divorce action signed a mutual release in which they released one another and their predecessors, successors, assigns, heirs, executors, and administrators, as well as their legal representatives. *Id.* at *1 n. 1. The wife had sought to avoid application of the release by establishing it was unenforceable due to fraud, duress, mistake, and lack of consideration. *Id.* at *1. The attorney filed a motion for summary judgment, which the trial court granted without specifying its grounds. *Id.* at *1. We affirmed the grant of summary judgment and found that the wife did not raise a fact issue concerning the enforceability of the release. *Id.* However, nowhere in *Cramer* did we specifically hold that the term "legal representatives" necessarily and in every case includes attorneys at law. In affirming the summary judgment on the grounds that the release was enforceable, we did not analyze its specific usage in conjunction with other provisions of the release or the traditional common law definition. Thus, we could only speculate what language, terms, or omissions of terms in the release prompted the *Cramer* court to affirm the summary judgment of the trial court on the grounds that the attorney was released from claims asserted by the wife. Here, McMahan does not argue the release is unenforceable as to Henderson, but that he is not covered by it. Thus, McMahan places the scope of the term "legal representatives" directly at issue, and we are called upon to discern the intent of the parties in the instant transaction.

Henderson also cites the related case of *Beach v. Beach,* in which this court dealt with a declaratory judgment premised upon both an action by the *Cramer* attorney and a motion and action by his client, the husband. 912 S.W.2d 345, 346 (Tex. App.-Houston [14th Dist.] 1995, no writ). The attorney sought a declaration that the wife had no cause of action against him and that the divorce decree terminated any causes of action she might have had, while the husband filed a motion to enforce the divorce decree and a request for a declaratory judgment that the wife had no causes of action against either the attorney or the husband. *Id.* at 347. The scope and definition of the term were not directly at issue on appeal. Before finding that the trial court's declaratory judgment was a nullity, this court suggested in dicta that although the attorney was not a party to the release in question and was not referred to by name in the release he was nevertheless referred to by the term "legal representatives." *Id.* at 346 n. 1. *Beach* stands for the proposition that the trial court was deprived of the power to enter the declaratory judgment because the attorney's intervention was untimely and the husband's motion and action for declarato-

ry judgment petitioned the trial court to stray beyond its power to enforce the division of property after the rendition of the divorce decree. *Id.* at 348. Thus, we cannot say that the dicta in *Beach* is dispositive of our inquiry when that case did not directly confront the issue at hand.

Henderson also cites a series of state and federal cases in support of his proposition that an attorney is necessarily a "legal representative." However, we note that in some of those cases, the term is used merely in dicta or in a recitation of factual or procedural background.[9] In none of the cases was the court confronted with the task of interpreting the term "legal representatives."

### 3. Are Attorneys Necessarily Legal Representatives?

Our research reveals that a majority of courts, when confronted with the issue of whether an attorney falls within the definition of the term "legal representatives," have rejected the argument advanced by Henderson. Federal courts have refused to interpret the term, as used in Federal Rule of Civil Procedure 60 governing relief from final judgments, to include attorneys. *See Western Steel Erection Co. v. United States,* 424 F.2d 737, 739 (10th Cir.1970) ("We therefore hold that an attorney does not have standing to move under [Federal Rule of Civil Procedure] 60(b) as a 'legal representative.'"); *Mobay Chem. Co. v. Hudson Foam Plastics Corp.,* 277 F.Supp. 413, 416–18 (S.D.N.Y.1967) (finding the phrase "legal representative" as used in Federal Rule of Civil Procedure 60(b) does not include legal counsel within the context of the attorney-client relationship); *see also Rende v. Kay,* 415 F.2d 983, 985 (D.C.Cir.1969) ("Although the attorney for the defendant was retained to 'represent' the deceased as his counsel, he is not a person who could be made a party, and is not a 'representative of the deceased party' in the sense contemplated by [Federal Rule of Civil Procedure] 25(a)(1).") So too have state courts concluded that an attorney is not a "legal representative." *Peterson v. Ballard,* 292 N.J.Super. 575, 679 A.2d 657, 661–62 (1996) (declining to hold that the statutory term "legal representative" is synonymous with "attorney"); *Etterle v. Excelsior Ins. Co. of New York,* 74 A.D.2d 436, 428 N.Y.S.2d 95, 98(N.Y.App.Div.1980) (noting that "[t]here is nothing here which suggests that, in the context of the power of attorney, the attorney in fact becomes a 'legal representative'"); *but see Regents of Univ. of New Mexico v. Lacey,* 107 N.M. 742, 764 P.2d 873, 875 (1988) (finding the statutory interpretation that an attorney is a legal repre-

---

9. *See, e.g., Walters v. Nat'l Ass'n of Radiation Survivors,* 473 U.S. 305, 371 n. 22, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (Stevens, J., dissenting) ("The statute, moreover, on the one hand, recognizes and allows legal representation, but on the other hand restricts the veteran's right to choose and to consult a legal representative in any meaningful manner, thus virtually reducing the right to counsel to nonexistence."); *United States v. Kaczynski,* 239 F.3d 1108, 1121 (9th Cir.2001) (Reinhardt, J., dissenting) ("All three are superb attorneys, and [appellant] could not have had more able legal representatives."); *Ex parte Lockhart,* 868 S.W.2d 346, 349 (Tex.Crim. App.1993) (noting that Texas Resource Center attorneys "filed the defendant's 'pro-se' application for stay and other related motions, acting at all times as his legal representative"); *Employers Cas. Co. v. Tilley,* 496 S.W.2d 552, 558 (Tex.1973) (noting that under an insurance policy in question the "attorney becomes the attorney of record and the legal representative of the insured, and as such he owes the insured the same type of unqualified loyalty as if he had been originally employed by the insured"); *Dow Chem. Co. v. Benton,* 163 Tex. 477, 357 S.W.2d 565, 568 (1962) ("If we were to adopt respondents' position in the present case, the effect would be that an attorney is no longer merely the legal representative of his client.")

sentative "not unreasonable" as attorneys are agents or those "appointed and authorized to act in the place or stead of another").

▮ This primary meaning of the term "legal representatives" would, of course, yield to a context which clearly showed a different meaning was intended. *See Woolsey v. Nationwide Ins. Co.,* 884 F.2d 381, 384 (8th Cir.1989) (noting the term "legal representatives" may also have a "wider meaning depending on the intentions of the parties as manifested by the context of the policy or the surrounding circumstances."); *Milner v. Dudrey,* 77 Nev. 256, 362 P.2d 439, 442–43 (1961) (noting that the words "legal representative" "should be interpreted in each case in accord with the surrounding facts and circumstances."); *Larkins v. Routson,* 115 Ohio St. 639, 155 N.E. 227, 230 (1927) (noting that the phrase "is to be construed in the light of the context, the subject-matter, and the circumstances under which it is used.") Here, nothing in the language of the settlement agreement indicates that the parties' intended the term "legal representatives" was to be used other than in its ordinary sense. The classes of persons identified in the agreement, *i.e.,* "predecessor, successor, assigns, heirs, executors, administrators, and legal representatives," refer to people or entities that could stand in the place of or assert the same rights as a party to a lawsuit. *See* BLACK'S LAW DICTIONARY 46, 118, 570, 724, 896, 1177, 1431. The listing of such persons in the release does not include attorneys or other mere agents of the parties.

### 4. Internal Consistency

▮ Furthermore, in construing a written contract, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will

be rendered meaningless. *Coker,* 650 S.W.2d at 393. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* Here, the term "legal representatives" occurs in a phrase which includes various entities which contemplate prospective parties or holders of an interest in an action—"predecessor, successor, assigns, heirs, executors, administrators, and legal representatives"—rather than agents or those engaged in the practice of law. In that context, it seems more likely the release was referring to some sort of legal party substitute rather than outside counsel when it recited those who would be affected by the release. This is also evidenced by the fact that elsewhere in the settlement agreement Henderson is specifically referred to by the phrase "[the parties'] respective attorneys," rather than the term "legal representatives."

The settlement agreement repeatedly distinguishes between an "attorney" and a "legal representative" and does not treat these terms as synonymous. The phrase "legal representatives" in the settlement agreement did not specifically identify Henderson as a released party. *Cf. Ill. Nat'l Ins. Co. v. Perez,* 794 S.W.2d 373, 376 (Tex.App.-Corpus Christi 1990, writ denied) (holding that term "insurers" in settlement agreement release did not bar claim against workers' compensation carrier). Had the intention of the parties been to extend the scope of the document to release the parties' attorneys, they could easily have referred to Henderson as a "legal representative" rather than an "attorney" or included a definitional section which clarified the usage of the term. The omission of the word "attorney" from the list of those parties released, notwithstanding the repeated use of that word in the provisions of the release, must be deemed

to indicate that the term "legal representative" was not meant to include a party's attorney.

### 5. Conclusion

In accordance with all the foregoing authority, we will perform our duty to select and apply a meaning of "legal representatives" which would be fair and reasonable, consistent with the entire context of the language in which the words are employed, and would effectuate the purpose of the release rather than defeat it. Henderson does not allege he acted in a capacity other than as the attorney for the Greenwood defendants. Nor does he represent that his interest in the claim is such that he should be made a party on behalf of his client. Henderson, as an attorney, is not one whose rights are bound up with those of the parties to the suit, nor is an attorney contemplated to become a party to the suit by virtue of his status as legal counsel. We find the term "legal representatives" as used in the settlement agreement is not synonymous with "attorney" and was not intended to include the attorneys to the transaction. Accordingly, we find that in signing the release, McMahan did not relinquish his claims against Henderson.

### C. Statute of Limitations

Henderson next argues that all of McMahan's causes of action are barred under the statutes of limitations. Specifically he contends that, because McMahan's alleged damages all accrued, at the latest, at the time he signed the settlement agreement, all of his claims are barred under the two-year statute of limitations.[10] The settlement agreement was signed on March 30, 1994, and McMahan filed suit on March 27, 1998.

McMahan pleaded four means for avoiding application of the statute of limitations: (1) the discovery rule; (2) fraudulent concealment; (3) the doctrine of unclean hands; and (4) absence from state.

### 1. Discovery Rule

When application of the discovery rule is raised by the non-movant, a party moving for summary judgment on the affirmative defense of limitations must prove as a matter of law that there is no genuine issue of material fact as to when the non-movant's causes of action accrued and when the movant discovered, or in the exercise of reasonable diligence should have discovered, the nature of his or her injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In attempting to meet this burden for negating the discovery rule, Henderson relied on a letter exhibit in McMahan's response opposing summary

---

10. Henderson argues that because McMahan alleged the existence of an attorney-client relationship, all of his claims are subsumed under the malpractice claim, citing *Dear v. Scottsdale Ins. Co.*, 947 S.W.2d 908, 917 (Tex. App.-Dallas 1997, writ denied) (holding that legal malpractice claims are governed by the two-year statute no matter how characterized), and thus governed by the two-year statute of limitations rather than the four-year statutes applicable to contract claims. McMahan's pleadings appear to raise alternate claims based on both the existence and absence of an attorney-client relationship. We recently noted that the rule against dividing or fracturing a negligence claim prevents legal-malpractice plaintiffs from opportunistically transforming a claim that sounds only in negligence into other claims. *See Deutsch v. Hoover, Bax & Slovacek, L.L.P,* 97 S.W.3d 179, 189–90 (Tex.App.-Houston [14th Dist.] 2002, no pet. h.). However, this rule does not prohibit a client from suing his attorney on a claim other than negligence. *See id.* at 189. Regardless, we need not define the precise parameters of McMahan's lawsuit because we find, as discussed above, that Henderson has not conclusively proven his limitations argument.

judgment. The letter, dated April 3, 1989 and written by Howard Greenwood, states that Fine Rides was owned 100% by Howard Greenwood Investments, Inc. Henderson argues the letter proves that McMahan knew or should have known the nature of his injury in 1989.

■ Henderson's proof fails to establish his limitations defense, as the letter does nothing more than prove what McMahan knew as of the time he filed his response to the motion for summary judgment, falling far short of conclusively proving that McMahan knew or should have known of its content prior to that time. Furthermore, the letter does not necessarily put McMahan on notice as a matter of law of any alleged fraud in the division of stock ownership rights. McMahan states the business was started in April of 1989 and that he was to receive his stock only after contributing assets to the company. In absence of proof by Henderson that the assets had in fact been contributed and McMahan's stock ownership rights accrued by April 3, 1989, the letter's statement regarding ownership of the stock as of that date was not necessarily incorrect. Thus, the letter would not have necessarily put McMahan on notice of any alleged fraudulent conduct at that time. Accordingly, we find Henderson failed to conclusively negate application of the discovery rule.

### 2. Fraudulent Concealment

■ To prove fraudulent concealment, a plaintiff must demonstrate the defendant had actual knowledge that a wrong occurred, a duty to disclose the wrong, and a fixed purpose to conceal the wrong. *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 436 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *Li v. Univ. of Tex. Health Science Ctr.*, 984 S.W.2d 647, 653 (Tex.App.-Houston [14th Dist.] 1998, pet

denied). Thus, to raise fraudulent concealment as a means of tolling limitations, McMahan must have first offered proof that Henderson had actual knowledge that a wrong occurred.

McMahan's core complaints against Henderson are that (1) Henderson verbally told him he had obtained stock ownership in Fine Rides by contributing assets to the company and did not need to actually receive stock certificates; (2) he contributed additional assets believing he was a shareholder; (3) he signed the settlement agreement after being led to believe he owned stock in a failed business; and (4) he subsequently received a letter from Henderson dated September 19, 1996 telling him he could not receive tax credits for the losses because he had never been a shareholder and had never received stock certificates. These allegations are supported in the record by McMahan's affidavit and the letter from Henderson, and provide at least some evidence that Henderson had actual knowledge of the alleged wrongful acts. Taking as true McMahan's allegation that Henderson told him he was a shareholder, we find Henderson's statement in the 1996 letter that McMahan *never* was a shareholder raises a reasonable inference that Henderson knew the verbal statements were false when made.

■ It is the second element—duty to disclose—that Henderson vigorously disputes. Henderson contends the doctrine of fraudulent concealment is inapplicable as he had no duty to disclose anything to McMahan in the absence of an attorney-client relationship between them. However, as stated later in our discussion of McMahan's claims of legal malpractice, we find McMahan presented more than a scintilla of evidence regarding the existence of an attorney-client relationship as of the time the alleged misrepresentations oc-

curred.[11] Regardless, McMahan stated in his affidavit that Henderson represented to him that he, McMahan, was an owner of Fine Rides and that receiving actual stock certificates was a mere formality. Even if Henderson had only been representing the Greenwood defendants when he allegedly made those statements, or later when he allegedly failed to disclose the falsity of the statements during negotiations, he was still under a duty to disclose the entire truth and to correct any misimpressions caused by his earlier statements. *See Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 212–13 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Consequently, there is at least some evidence to show he had a duty to disclose.

McMahan's proof is also sufficient to raise a fact issue on the third element of fraudulent concealment, as there is at least some evidence that when Henderson allegedly told McMahan he was a shareholder in Fine Rides, Henderson would have known this was not true, yet he continued to conceal the fact that McMahan was not a shareholder. In short, we find McMahan presented sufficient proof to raise a fact issue as to each element of his fraudulent concealment defense to the statute of limitations.

### 3. Unclean Hands

McMahan further asserted that Henderson could not utilize a limitations defense because Henderson violated the doctrine of clean hands. The doctrine can be raised by a plaintiff, but only to attack an equitable defense alleged by a defendant. *See generally Steubner Realty*

19, *Ltd. v. Cravens Rd. 88, Ltd.,* 817 S.W.2d 160, 165–66 (Tex.App.-Houston [14th Dist.] 1991, no writ); *Hughes v. Aycock,* 598 S.W.2d 370, 375 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.). As limitations is a statutory defense not grounded in equity, *see* 30A C.J.S. *Equity* § 154 (comparing statute of limitations defense with equitable defense of laches), we find that as a matter of law, McMahan's unclean hands argument fails.

### 4. Absence from State

McMahan also argued that Henderson's absence from the state tolled the statute of limitations. However, he failed to address this issue in his response to Henderson's summary judgment motion, and on appeal, acknowledges that Henderson's absence was probably not sufficient to toll limitations for a legally significant period of time. Accordingly, this argument was not preserved in the trial court and has been abandoned on appeal. *See Cuyler,* 60 S.W.3d at 216.

We find Henderson failed to conclusively negate the discovery rule and McMahan presented sufficient proof to raise a fact issue as to each element of fraudulent concealment. Accordingly, the trial court's summary judgment is not supported by Henderson's limitations defense.

### D. No–Evidence Grounds

### 1. Fraud/Fraudulent Inducement

McMahan contends Henderson falsely told him he was a shareholder of Fine Rides to induce him into contributing as-

---

11. In analyzing the fiduciary nature of the attorney-client relationship, the Texas Supreme Court has observed:

 As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation. The client must feel free to rely on his attorney's advice. Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved. Further, breach of the duty to disclose is tantamount to concealment.

 *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988) (citations omitted).

sets to the company, and then failed to correct the misrepresentation prior to the execution of the settlement agreement. Henderson's summary judgment motion raised no-evidence grounds against these claims, and alleged that: (1) any misrepresentations as to stock ownership were not material because McMahan released any claim to stock ownership in the settlement agreement; (2) any failure to disclose was not fraudulent because there was no duty to disclose; and (3) any misrepresentation or failure to disclose was not actionable because it occurred in an adversarial context.

■■ Henderson's first argument ignores the very point of McMahan's fraudulent inducement claim: that he would not have signed the settlement agreement had he known Henderson's representations were false. Accordingly, we find as a matter of law that the release language does not defeat McMahan's fraudulent inducement claims against Henderson, and that McMahan presented at least some evidence that Henderson made material misrepresentations.

■■ Henderson's second argument also fails, as we have already found McMahan presented more than a scintilla of evidence to demonstrate that under the facts of this case, Henderson had a duty to disclose McMahan's lack of stock ownership.

Henderson's third argument appears to challenge the reasonableness or justification of McMahan's reliance on his statements. Henderson couches his arguments in terms of the tort of negligent misrepresentation. McMahan pleaded this cause of action and we discuss it in detail below. We find McMahan presented more than a scintilla of evidence that he justifiably relied on Henderson's statements. Accordingly, we find Henderson's no-evidence grounds against McMahan's fraud and fraudulent inducement causes of action without merit.

## 2. Duress

Henderson next raised no-evidence arguments against McMahan's claim that he signed the settlement agreement under duress. As McMahan's claims of duress against Henderson parallel those raised against the Greenwood defendants, we reach the same conclusion as with the Greenwood defendants, and find no evidence of duress. Accordingly, the trial court did not err in granting summary judgment against McMahan on his claim that he signed the release under duress.

## 3. Malpractice and Breach of Fiduciary Duty

■■ Henderson alleged traditional and no-evidence summary judgment grounds against McMahan's claims of legal malpractice and breach of fiduciary duty. In a legal malpractice claim, a plaintiff must prove the attorney owed the plaintiff a duty, that duty was breached, the breach proximately caused the plaintiff's injuries, and damages occurred. *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 496 (Tex.1995). Attorneys may be liable for a breach of fiduciary duty, but such a claim requires allegations of self-dealing, deception, or misrepresentations that go beyond the mere negligence allegations in a malpractice action. *See Goffney v. Rabson,* 56 S.W.3d 186, 193–94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim. *Deutsch,* 97 S.W.3d at 189. If, however, the client's complaint is more appropriately classified as a fraud, DTPA,

breach of fiduciary duty, or breach of contract complaint, then the client can assert a claim other than negligence. *See id.* As Henderson made the same argument for both of these propositions, we address them together.

■ McMahan alleged that because Henderson gave him false information and advice regarding his stock ownership in Fine Rides, he continued to transfer assets to Fine Rides and later signed the settlement agreement, rather than attempting to recover the full value of the assets he contributed. Henderson's sole argument in his motion is that there is no evidence of an attorney-client relationship between himself and McMahan at the time of the negotiation, preparation, and execution of the settlement agreement. Henderson's argument, however, misinterprets McMahan's allegations.

■ McMahan contends Henderson was his attorney at the time Henderson made the statements to him regarding his stock ownership in Fine Rides, not at the time of the settlement negotiations. McMahan's affidavit states he and Howard Greenwood went to Henderson to obtain advice on structuring the business and to have him draft the necessary documents for incorporating Fine Rides. According to McMahan, Henderson prepared all of the documents and later provided advice specifically to him on other matters regarding Fine Rides. McMahan expressly stated he understood Henderson to be acting as his attorney. Henderson's motion and attached affidavit do not refute the existence of an attorney-client relationship during that earlier period, nor does evidence that Henderson was Greenwood's attorney at the formation of Fine Rides conclusively prove he was not also acting as McMahan's attorney at the time. *See Yaklin v. Glusing, Sharpe & Krueger,* 875 S.W.2d 380, 384 (Tex.App.-Corpus Christi 1994, no writ) (holding that evidence attorney represented one party to transaction did not conclusively prove he did not also represent other party). Henderson cites no authority for the proposition that once an attorney-client or other fiduciary relationship terminates, the burden rests on the client or beneficiary to determine the veracity of statements made by the attorney or fiduciary during the course of the relationship. Indeed, Texas law holds to the contrary: if an attorney or fiduciary has made misstatements, it is incumbent upon him or her to make a full disclosure of the truth. *See generally Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988); *Anderson, Greenwood & Co.,* 44 S.W.3d at 212–13. Accordingly, we find McMahan's malpractice and breach of fiduciary duty claims survive Henderson's no-evidence grounds for summary judgment.

### 4. Negligent Misrepresentation

Henderson next presented a no-evidence ground challenging McMahan's claim for negligent misrepresentation. Under section 552 of the Restatement of Torts:

> One who, in the course of his ... profession ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977). The Texas Supreme Court recognizes that although this provision imposes a duty on attorneys to avoid misrepresentation irrespective of privity, liability is limited under section 552(2)(a) to situations in which the attorney providing the information is aware of the non-client and intends that the non-client rely on the information. *McCamish, Martin, Brown &*

*Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex.1999).

McMahan argues that if Henderson represented only the Greenwood defendants at the time he allegedly made the statements regarding stock ownership, then Henderson made false statements without exercising reasonable care or competence in obtaining or communicating the information and with the intent that McMahan rely on the misrepresentations. Henderson counters, however, that there is no evidence of any alleged material misrepresentation and that the evidence conclusively demonstrates that he and McMahan were in adversarial positions during the negotiation, drafting, and execution of the settlement agreement, such that McMahan could not have justifiably relied on Henderson's statements regarding stock ownership. Henderson's arguments are identical to those he asserted against McMahan's fraud and fraudulent inducement causes of action. For the reasons we rejected them there, we reject them here.

■■■■ In determining whether a plaintiff has met the requirement of justifiable reliance under section 552, we must consider the nature of the relationship between the attorney, the client, and the nonclient. *Id.* Generally speaking, a third party is not justified in relying on an attorney's representation when made in an adversarial context. *Id.* However, not every situation outside of litigation is clearly defined as adversarial or nonadversarial, and consequently, we examine the extent to which the interests of the client and the third party are consistent with one another. *Id.*

Here, while statements made during settlement negotiations were likely made in an adversarial context, statements made during the formation and operation of Fine Rides most likely were not. Absent fraud, the Greenwood defendants and McMahan were ostensibly working toward the same goal of a successful business venture, and Henderson's alleged initial statements regarding stock ownership would have acted to ensure that McMahan continued to work for Fine Rides and contributed assets to the company.

■■■■ Henderson cites no authority, and we have found none, suggesting that simply because parties become adversarial after statements are made, the non-client cannot continue to justifiably rely on the uncorrected earlier statements. The extent, if any, to which the change in the nature of the relationship to an adversarial one may have affected the justification of McMahan's reliance is a question of fact, and the trial court erred in granting summary judgment against McMahan's negligent misrepresentation claims.

### 5. Conspiracy

■■■■ Last, Henderson lodged no-evidence grounds against McMahan's conspiracy claims. To prove a conspiracy, McMahan must show a combination of two or more persons, an object to be accomplished, *i.e.,* an unlawful purpose or a lawful purpose by unlawful means, a meeting of minds on the object or course of action, one or more unlawful, overt acts, and damages as the proximate result. *See Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 675 (Tex.1998).

■■■■ Henderson argues only that there is no evidence he committed any unlawful overt act. Because we have found McMahan's fraud, fraudulent inducement, legal malpractice, and negligent misrepresentation claims survive Henderson's no-evidence challenges, we also conclude there is at least some evidence that Henderson committed an unlawful overt act against McMahan, and find the trial court erred in

granting summary judgment against McMahan's conspiracy claims.

In sum, we find the trial court erred in granting Henderson's summary judgment motion on McMahan's fraud, fraudulent inducement, legal malpractice, breach of fiduciary duty, negligent misrepresentation, and conspiracy claims.

### E. Objections to McMahan's Affidavits

McMahan attached lengthy affidavits to his response to the motions for summary judgment. Although appellees raised numerous objections to these affidavits at trial, they failed to obtain written rulings on the objections. Consequently, any objections as to form (such as hearsay, speculation, competence) are waived. *See Hou–Tex v. Landmark Graphics*, 26 S.W.3d 103, 112 (Tex.App.-Houston [14th Dist.] 2000, no pet.). However, any objections relating to substantive defects (such as lack of relevancy, conclusory) can be raised for the first time on appeal and are not waived by the failure to obtain a ruling from the trial court. *See id.* We find it unnecessary to determine whether each statement in McMahan's affidavits would be admissible evidence. *See* Tex.R. Civ. P. 166a(f) (stating that affidavits in support of summary judgment must set forth facts as would be admissible). Instead, in our analysis, we have considered only statements that we deem to be admissible in light of the failure to obtain written rulings at trial.

### V. Motion for Continuance

In his third issue, McMahan contends the trial court erred in denying his motion for continuance filed prior to the hearing on Henderson's no-evidence motion for summary judgment. The decision to grant or deny a motion for continuance is within the trial court's discretion,

and such determination will be reversed only upon showing of a clear abuse of discretion. *Clemons v. State Farm Fire & Cas. Co.*, 879 S.W.2d 385, 393 (Tex.App.-Houston [14th Dist.] 1994, no writ). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A party may move for a no-evidence summary judgment after adequate time for discovery has passed. Tex.R. Civ. P. 166a(i); *Specialty Retailers, Inc. v. Fuqua*, 29 S.W.3d 140, 145 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). "Adequate time" is determined by the nature of the cause of action, the evidence necessary to controvert the no-evidence motion, and the length of time the case had been active. *Id.* A court may also look to factors such as the amount of time the no-evidence motion has been on file, whether the movant has requested stricter time deadlines for discovery, the amount of discovery that has already taken place, and whether the discovery deadlines that are in place are specific or vague. *Id.*

McMahan filed the present lawsuit on March 27, 1998. The order granting summary judgment was signed on July 24, 2000. Consequently, a total of almost twenty-eight months lapsed between the time the lawsuit was filed and the grant of summary judgment. Factoring in a sixteen-month bankruptcy stay, there remained a full year for discovery. Furthermore, the stay did not prevent McMahan from continuing to develop his case from those documents already in his possession.

McMahan's motion for continuance alleged Henderson's counsel engaged in dilatory tactics regarding responses to written discovery, which led to an earlier continuance being granted. The record does not contain any prior motion for a continuance nor does McMahan contend, in his motion

or in his appellate briefs, that the alleged dilatory tactics on written discovery continued beyond the grant of the initial continuance. Standing alone, these allegations of past tactics do not support the conclusion that the trial court erred in refusing a second continuance, particularly in light of the granting of the first continuance. *Cf. Lattrell v. Chrysler Corp.,* 79 S.W.3d 141, 147 (Tex.App.-Texarkana 2002, pet. denied) (considering grant of prior continuance as militating against finding error in denial of subsequent motion).

McMahan's motion further alleges Henderson's counsel delayed discovery by seeking to quash a scheduled deposition. On appeal, McMahan claims the motion to quash pertained to Henderson's deposition. However, Henderson stated to the trial court, and argues on appeal, that the motion to quash was of *McMahan's* deposition. The motion itself does not appear in the record, and we assume that missing portions of the record support the correctness of the trial court's judgment. *McFarland v. Szakalun,* 809 S.W.2d 760, 764 (Tex.App.-Houston [14th Dist.] 1991, writ denied). In either event, assuming the quashed deposition was McMahan's, he cannot contend it hampered his preparation of a response to the motion for summary judgment, as anything he would have said in the deposition, he could have said in his affidavit. And assuming the quashed deposition was of Henderson, this fact, without information as to the timing of the motion to quash and the diligence of McMahan's attempts to set the deposition, would not support a finding of abuse of discretion. *Cf. Laughlin v. Bergman,* 962 S.W.2d 64, 66 (Tex.App.-Houston [1st Dist.] 1997, no pet.) (finding error in denial of motion where movant had been thwarted in numerous attempts to schedule opposing party's deposition and had agreed to date two months after party's motion for summary judgment was filed).

McMahan makes no argument and cites to no references in the record that would allow us to determine the extent of discovery undertaken prior to the filing of the motion, the nature of any discovery deadlines imposed by the court, or the length of time between the filing of Henderson's no evidence points and the hearing on the motion. Consequently, these factors cannot be said to weigh in McMahan's favor. We do not find the trial court abused its discretion in denying the motion for continuance, and overrule McMahan's third issue.

## VI. Motion for New Trial

In his fourth issue, McMahan contends the trial court erred in denying his motion for new trial because the evidence attached to his motion, which had not been attached to his responses to Henderson's and the Greenwood defendants' motions for summary judgment, defeats those motions. McMahan fails, however, to offer a cogent basis on which we may consider the additional evidence. In his brief, McMahan only argues that the new evidence defeats the motions for summary judgment. He also argues that the denial of a new trial was an abuse of discretion, whether in the interest of justice or to simply correct mistakes. He fails, however, to link either the "interest of justice" or the trial court's alleged mistakes to consideration of the additional evidence. Accordingly, we find this issue has been waived. *See* TEX.R.APP. P. 38.1(h) (stating that "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.,* 979 S.W.2d 730, 758 (Tex.App.-Houston [14th Dist.] 1998, no pet.).

Moreover, nothing in the record requires us to consider the additional evidence even if McMahan had properly briefed his arguments. Generally, a party may not rely on new evidence in a motion for new trial without showing that the evidence was newly discovered and could not have been discovered through due diligence prior to the ruling on a summary judgment motion. *Risner v. McDonald's Corp.*, 18 S.W.3d 903, 909 (Tex.App.-Beaumont 2000, pet. denied); *Longoria v. United Blood Servs.*, 907 S.W.2d 605, 609 (Tex. App.-Corpus Christi 1995), *rev'd on other grounds*, 938 S.W.2d 29 (Tex.1997). McMahan does not argue, either in his motion or his appellate briefs, that the evidence attached to his motion for new trial was newly discovered and could not have been discovered through due diligence prior to the trial court's ruling. *See Risner*, 18 S.W.3d at 909; *Longoria*, 907 S.W.2d at 609.

At least one court has held that if a trial court indicates it considered new evidence attached to a motion for new trial, a reviewing appellate court should also consider that evidence. *See Oryx Energy Co. v. Union Nat'l Bank*, 895 S.W.2d 409, 412 n. 3 (Tex.App.-San Antonio 1995, writ denied). However, the record here does not affirmatively demonstrate that the trial court considered the new evidence or that McMahan requested leave of court to file additional evidence. *See id.* (noting that trial court gave leave to file motion with additional evidence). In its order denying the motion for new trial, the court states it considered the motion, all responses, and argument of counsel, but does not state it considered the evidence attached to the motion. Indeed, both Henderson and the Greenwood defendants' in their responses to the motion argued that the court could not consider the evidence. The court may well have agreed with those arguments and declined to review the evidence. Although the record does contain an earlier order denying Henderson's motion to strike the exhibits attached to the motion for new trial, this is not tantamount to either leave of court to file additional evidence or an indication the court considered the new evidence. We find no basis in the record to compel a review of the evidence attached to the motion for new trial, and overrule the fourth issue.

## VII. Sanctions

In his response brief, Henderson characterizes McMahan's appeal as frivolous and requests that we impose sanctions against him under Rule 45 of the Texas Rules of Appellate Procedure. Whether to grant sanctions is a matter of discretion that we exercise with prudence and caution and only after careful deliberation and in truly egregious circumstances. *Angelou v. African Overseas Union*, 33 S.W.3d 269, 282 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Because we have found merit in some of McMahan's arguments, we hold that the appeal was not frivolous and deny the request for sanctions.

## VIII. Conclusion

We affirm the summary judgment granted in favor of the Greenwood defendants and affirm in part, reverse in part, and remand for further proceedings the judgment favoring Henderson. Specifically, on remand, McMahan may continue to pursue his fraud, fraudulent inducement, legal malpractice, breach of fiduciary duty, negligent representation, and conspiracy causes of action against Henderson, but not his claims on conversion, concert of action, contract, or duress.