OPINION




No. 04-04-00182-CV



Sandra Silva de TAMEZ, Individually as Representative of Juan
Guadalupe Tamez (Deceased) and as Next Friend of Denise Silva
de Tamez, a Minor Child, and Michael G. Willoughby,
Appellants



v.



SOUTHWESTERN MOTOR TRANSPORT, INC.,


Appellee



From the 407th Judicial District Court, Bexar County, Texas


Trial Court No. 2002-CI-02179


Honorable Michael P. Peden, Judge Presiding



Opinion by: Karen Angelini, Justice


Sitting: Karen Angelini, Justice

 Sandee Bryan Marion, Justice

 Phylis J. Speedlin, Justice


Delivered and Filed: December 8, 2004 


AFFIRMED

 Sandra Silva de Tamez, as spouse of Tamez, as the representative of his Estate, and as next
friend of Denise Silva de Tamez, a minor child, and Alicia Montalvo de Tamez ("Tamez") and
Michael G. Willoughby appeal the summary judgments rendered in favor of Southwestern Motor
Transport, Inc. ("SMT"). Tamez sued SMT and Willoughby under the Wrongful Death Act and
Survival Statute for personal injuries and damages arising from a tractor-trailer accident.
Subsequently, Willoughby cross-claimed against SMT and Edwin Montalvo and counter-sued Tamez,
alleging negligence and vicarious liability. SMT filed two separate motions for summary judgment
against Tamez and Willoughby, both based on the affirmative defenses of waiver and release. SMT
contended that the Release Agreements signed by both Tamez and Willoughby released SMT from
liability for any injuries caused by the negligent acts and/or omissions of SMT and/or its employees,
officers, agents and/or servants. The trial court granted SMT's motions as to all claims. We affirm
the judgment of the trial court.

BACKGROUND

 Juan Guadalupe Tamez died and Michael G. Willoughby was seriously injured when the
tractor-trailer in which they were driving crashed into an interstate overpass. At the time of the
incident, Tamez and Willoughby were team co-drivers operating a tractor-trailer that Edwin
Montalvo Trucking ("Montalvo") leased to Southwestern Motor Transport, Inc. ("SMT") pursuant
to an Independent Contractor Service Agreement. Willoughby and Tamez were employees of
Montalvo. 

 Prior to driving for SMT, SMT required that all leased drivers sign a pre-injury release
agreement purportedly releasing SMT from any liability due to negligent acts and/or omissions on its
part. On March 20, 2001, Willoughby signed a pre-injury release agreement ("Release Agreement").
On May 4, 2001, Tamez signed an identical Release Agreement. On May 5, 2001, Willoughby and
Tamez embarked on the trip that is subject of this dispute. 

 All parties agree that this appeal involves the resolution of a single issue: Is the Release
Agreement signed by both Willoughby and Tamez enforceable as a matter of law? We hold that this
Release Agreement is a standard third-party release that is valid and binding upon Willoughby and
Tamez. Accordingly, we overrule all issues on appeal, and affirm the summary judgment of the trial
court. 

RELEASE AGREEMENT

 A release agreement, valid on its face, is, until set aside, a complete bar to any action based
on matters covered in the release. McMahan v. Greenwood, 108 S.W.3d 467 (Tex. App.--Houston
[14th Dist.] 2003, reh'g overruled). All releases are regarded as contracts and, as such, are governed
by the general rules relating to the construction of contracts. Id. 

A. Standard of Review

 We review a summary judgment de novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699
(Tex. 1994). Accordingly, we will uphold a summary judgment only if the summary judgment record
establishes that there is no genuine issue of material fact, and the movant is entitled to judgment as
a matter of law on a ground set forth in the motion. TEX. R. CIV. P. 166a©; Travis v. City of
Mesquite, 830 S.W.2d 94, 99-100 (Tex. 1992). In deciding whether the summary judgment record
establishes the absence of a genuine issue of material fact, we view as true all evidence favorable to
the non-movant and indulge every reasonable inference, and resolve all doubts, in its favor. Nixon
v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 

B. Contractual Requirements

1. Fair Notice

 Because pre-injury releases involve an extraordinary shifting of risk, we impose certain fair
notice requirements. See Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 507-08
(Tex. 1993). These fair notice requirements include the express negligence doctrine and the
conspicuousness requirement. Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex.
2004). The express negligence doctrine requires that the parties' intent to release liability from the
releasee's own future negligence must be expressed in unambiguous terms within the four corners
of the agreement. Id. The second requirement, conspicuousness, provides that the releasing language
must be conspicuously written, so that a reasonable person against whom it is to operate should
notice it. Id. Language that appears in contrasting type, colors, or in capitals satisfies the
conspicuousness requirement. Id. A release that fails to satisfy either of the fair notice requirements
of the express negligence doctrine or conspicuousness when they are imposed is unenforceable as a
matter of law. Id.

 Here, both fair notice requirements were satisfied. The Release Agreement signed by both
Willoughby and Tamez states:

 3. Release. I hereby agree to RELEASE Carrier from any and all
liability for any injury(ies) or other damage(s) to me caused in whole or in part
by Carrier and/or its employee(s), officer(s), agent(s) and/or servant(s),
including any and all such injury(ies) and/or damage(s) caused by or resulting
from the NEGLIGENT ACT(S) AND/OR OMISSION(S) of Carrier and/or its
employee(s), officer(s), agent(s) and/or servant(s).


The bolding, capitalization, and underlining is as indicated in the original Release Agreement. Here,
the release in favor of SMT easily satisfies the requirements of fair notice by reciting specifically that
SMT is being released from its own negligence and by using contrasting type to satisfy the
conspicuousness requirement. 

2. Meeting of the Minds

 Nevertheless, on appeal, both Willoughby and Tamez assert that summary judgment was
improper because fact issues remain regarding what Willoughby and Tamez understood the effect of
these documents to be. (1) A release encompasses the contractual element of mutual intent and whether
the minds of the parties have met. See Vera v. North Star Dodge Sales, Inc., 989 S.W.2d 13, 17
(Tex. App.--San Antonio 1998, no pet.). Specifically, Tamez contends that because he was limited
in his ability to read or write English, he was unable to understand a complex legal document such
as the Release Agreement. (2) Therefore, according to Tamez, there was essentially no meeting of the
minds and no binding contract of release. We disagree. 

 To the contrary, a person who signs a contract must be held to have known what words were
used in the contract and to have known their meaning, and he must be held to have known and fully
comprehended the legal effect of the contract. Nguyen Ngoc Giao v. Smith & Lamm, P.C., 714
S.W.2d 144, 146 (Tex. App.--Houston [1st Dist.] 1986, no writ). Moreover, illiteracy is no defense
and will not relieve a party of the consequences of the contract.

 (3) Vera, 989 S.W.2d at 17. Here, Tamez, a resident alien from Mexico, signed a release that satisfies the elements of fair
notice and conspicuously states that "I acknowledge that I have read this Agreement, and fully
understand the provisions and convenants contained in this Agreement." Therefore, even though
English was not his first language, we must presume, as a matter of law, that Tamez read and
understood the contract, unless he was prevented from doing so by trick or artifice. Vera, 989
S.W.2d at 17. Because Tamez has not raised an issue regarding fraud, misrepresentation, or
concealment in the procurement of the Release Agreement, we hold that it is a valid and binding
contract, and Tamez is bound by the terms of the instrument as fully as would those who could, and
did not, read it. See Indemnity Ins. Co., 101 S.W.2d at 173. Accordingly, we overrule this issue on
appeal.

3. Consideration

 In addition, Tamez and Willoughby argue that the Release Agreement must be declared void
for lack of consideration. We recognize failure of consideration as an affirmative defense to an action
on a written agreement. See Nat'l Bank of Commerce v. Williams, 84 S.W.2d 691, 692 (Tex. 1935).
A release agreement, like any contract, must be supported by valid consideration. Flatt v. Hill, 379
S.W.2d 926 (Tex. App.--Dallas 1964, writ ref'd n.r.e.). In accordance with the general rules of
contracts, consideration sufficient to support a release must consist of either a benefit to the releasor
or a detriment to the person released. Atkins v. Womble, 300 S.W.2d 688, 702-03 (Tex.
App.--Dallas 1957, writ ref'd n.r.e.). SMT asserts that it provided Tamez and Willoughby with two
benefits as consideration for the Release Agreement: (1) the ability to participate as leased co-drivers
for its company, and (2) occupational health insurance. With regard to SMT's first item of
consideration, we agree. 

a. Ability to Participate as Leased Co-drivers

 First, SMT asserts that it provided valid consideration to support the Release Agreements by
allowing Willoughby and Tamez to participate in a voluntary activity to which they had no legal
right--the ability to participate as leased co-drivers for SMT. We agree. When the releasor acquires
a legal right to which he would not otherwise be entitled in exchange for signing the release, the
releasor receives a benefit. See Atkins, 300 S.W.2d at 702-03. The Release Agreement, as signed
by Willoughby and Tamez, states that "as a condition to me being a driver and a passenger co-driver
of one or more trucks operated for Carrier, Contractor and Carrier require that I agree to the release
provisions and covenants contained in this Agreement." (4) Here, Tamez and Willoughby did not have
a legal right to participate as leased co-drivers for SMT. They were given the voluntary opportunity,
however, as part of their employment with Montalvo, to participate as leased co-drivers for SMT.
As a condition to participating in this voluntary activity, SMT required its drivers to sign the Release
Agreement. Therefore, by electing to participate as a leased co-driver for SMT, both Tamez and
Willoughby accepted the consideration proffered by SMT and granted a pre-injury release in return. 

b. Occupational Health Insurance

 SMT also claims that it provided valid consideration to support the Release Agreement
because Montalvo Trucking furnished occupational health insurance to Willoughby and Tamez
pursuant to the terms of its Independent Contractor Service Agreement with SMT. (5) We disagree
with SMT's contention, however, that this term constituted a statement of consideration for the
Release Agreement. While we recognize that it is not necessary that SMT directly furnish the
consideration for the Release Agreement, there still must be evidence that the consideration was
"bargained for" in exchange for the release. See TCA Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 672
(Tex. App.--Austin 2002, no pet.) (holding that advantage to party was not consideration when it
was neither promised nor given by anyone in exchange for obligations undertaken by party); see
generally RESTATEMENT (SECOND) OF CONTRACTS § 71 (1981). The ICS Agreement is a wholly
different contract as between SMT and Montalvo Trucking, establishing their rights and duties.
There is no indication in the ICS Agreement, and SMT does not cite to one, that would link a
provision in its terms to consideration for the later Release Agreement between Willoughby and
Tamez and SMT. 

 Nevertheless, only some consideration is necessary, and we hold that there was valid
consideration for the release based on Tamez and Willoughby's ability to participate as leased co-drivers. Accordingly, we overrule this issue on appeal.

C. Employment Relationship

 Therefore, the Release Agreement having satisfied all the contractual requirements of a
standard third-party release, Willoughby and Tamez further contend that the trial court erred in
entering summary judgment in favor of SMT since a fact question exists with regard to whether they
were employees of SMT. If Willoughby and Tamez were employees of SMT, Willoughby and Tamez
contend the Release Agreement should be either preempted by federal law or declared void as against
public policy. In maintaining that a fact issue exists with regard to this alleged employment
relationship, Willoughby and Tamez contend that: (1) they were "statutory employees" of SMT, or,
in the alternative, (2) they were SMT's borrowed servants. As to both, we disagree.

1. Statutory Employee 

 First, Willoughby and Tamez contend that they were "statutory employees" of SMT whose
waiver of liability provided under the Release Agreement was preempted by federal law, specifically
49 U.S.C. § 14102 and 49 C.F.R. § 376.12.


a. Background 

 During the first half of the twentieth-century, interstate motor carriers, like SMT, attempted
to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying
the drivers who operated the trucks as "independent contractors." See Morris v. JTM Materials,
Inc., 78 S.W.3d 28, 37 (Tex. App.--Fort Worth 2002, no pet.). Therefore, in 1956, Congress
amended the Interstate Common Carrier Act ("Act") to require interstate motor carriers to assume
full direction and control of the vehicles that they leased "as if they were the owners of such
vehicles." (6) Id. at 38. The purpose of the amendments to the Act was to ensure that interstate motor
carriers would be fully responsible for the maintenance and operation of the leased equipment and the
supervision of the leased drivers, thereby protecting the public from accidents, preventing public
confusion about who was financially responsible if accidents occurred, and providing financially
responsible defendants. Id. As a result of the regulatory authority granted in the Act, the Interstate
Commerce Commission issued regulations that require a certificated interstate carrier who leases
equipment to enter into a written lease with the equipment owner providing that the carrier-lessee
shall have exclusive possession, control, and use of the equipment, and shall assume complete
responsibility for the operation of the equipment, for the duration of the lease. 49 C.F.R. §§ 376.11-.12 (2000); Morris, 78 S.W.3d at 38. These regulations are known as the Federal Motor Carrier
Safety Regulations (FMCSR). 49 C.F.R. subch. B (2000).

 Because under the FMCSR, interstate motor carriers have both a legal right and duty to
control leased vehicles operated for their benefit, the regulations create a statutory employee
relationship between the employees of the owners-lessors and lessee-carriers. Morris, 78 S.W.3d at
38-39. The FMCSR preempt state law in tort actions in which a member of the public is injured by
the negligence of a motor carrier's employee while operating an interstate carrier vehicle. Id. at 39.
Thus, an interstate motor carrier's liability for equipment and drivers covered by leasing arrangements
is not governed by the traditional common-law doctrines of the master-servant relationship and
respondeat superior. Id. Instead, an interstate carrier is vicariously liable as a matter of law under
the FMCSR for the negligence of its statutory employee drivers. Id.



b. Analysis

 Citing the FMCSR, Willoughby and Tamez contend that, because they were statutory
employees of STM for purposes of protecting the public, SMT must be prevented from insulating
itself from liability due to its status as third-party rather than employer, and the Release Agreement
must be preempted by federal law. See 49 C.F.R. § 376.11-.12. We disagree. 

 Section 376.12 provides that "the authorized carrier lessee shall have exclusive use of the
equipment for the duration of the lease. The lease shall further provide that the authorized carrier
lessee shall assume complete responsibility for the operation of the equipment for the duration of the
lease." 49 C.F.R. § 376.12(c)(1). Nevertheless, paragraph (c)(4) of § 376.12 further instructs the
court: 

 Nothing in the provisions required by paragraph (c)(1) of this section is intended to
affect whether the lessor or driver provided by the lessor is an independent contractor
or an employee of the authorized carrier lessee. An independent contractor
relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and
attendant administrative requirements. 


In interpreting and reconciling these provisions, we agree with the rationale of the court in Pouliot
v. Paul Arpin Van Lines, Inc., 292 F.Supp.2d 374, 383 (D. Conn. 2003): "The import of this
language is plain-the existence of a lease under regulations that impose liability between the carrier-lessee and the public does not have any impact on the type of relationship that exists between the
carrier-lessee and the contractor-lessor." 

 In fact, the Fifth Circuit has specifically held that the policy underlying the FMCSR does not
apply as to co-employees of motor carriers injured by their fellow employees' negligence since they
could recover from their employer in workers' compensation. See Price v. Westmoreland, 727 F.2d
494, 497 (5th Cir. 1984); see also White v. Excalibur Ins. Co., 599 F.2d 50, 55-56 (5th Cir. 1979).
Here, Willoughby and Tamez could recover from Montalvo, their employer, via both occupational
health insurance and their common law rights. Accordingly, with regard to statutory employment,
we overrule this issue on appeal. 

2. Borrowed Servant

 Second, Willoughby contends that, because SMT retained control over the details of Tamez
and Willoughby's work, they were SMT's borrowed employees and/or SMT was a co- or dual
employer with Montalvo, thus making SMT liable for the consequences of Tamez and Willoughby's
negligence. Again, we disagree. 

 Under the "borrowed servant" doctrine, the employee of one employer can become the
employee of another "special" employer. In so doing, the central inquiry is which employer had the
power to control and direct the employees in the manner and details of their work. St. Joseph Hosp.
v. Wolff, 94 S.W.3d 513, 537 (Tex. 2002) (holding that the test for determining whether a person is
the employee of the general employer or the borrowed servant of the special employer is which
employer controls and gives specific direction to the borrowed employee). Generally, the right of
control and direction is a question of contract between the two employers. See Alice Leasing Corp.
v. Castillo, 53 S.W.3d 433, 440 (Tex. App.--San Antonio 2001, pet. denied). Moreover, where both
employers are operating under a contract expressly assigning the right to control, a court can dispose
of the borrowed employee issue without the necessity of considering the facts and circumstances of
the project. Id. Here, the Independent Contractor Service Agreement between SMT and Montalvo
explicitly gave Montalvo the right of control over Willoughby and Tamez. Accordingly, we hold that
neither Willoughby nor Tamez was an employee of SMT, and we overrule this issue on appeal. 

D. Public Policy

 Finally, in conjunction with their employment issues, Tamez and Willoughby contend that the
Release Agreement was void because it violated public policy. In alleging violations of public policy,
Willoughby contends that the Release Agreement was coercive because its execution was procured
as a condition of employment; it circumvented the policy favoring the provision of occupational
medical coverage for employees under the workers' compensation scheme; and it transferred the risk
of job-related injuries from SMT to its employees. A release, just as any other contract, is subject
to the public policy of the state. Ranger Ins. Co. v. Ward, 107 S.W.3d 820 (Tex. App.--Texarkana
2003, pet. denied).

 In addressing the Release Agreement with regard to public policy considerations, all parties
principally rely upon the court's analysis in Lawrence v. CDB Servs., Inc., 44 S.W.3d 544 (Tex.
2001), superseded by Tex. Lab. Code Ann. § 406.033(e) (Vernon Supp. 2004-05) ("Any agreement
by an employee to waive a cause of action or any right described in Subsection (a) before the
employee's injury or death is void and unenforceable). (7) In Lawrence, an employee sued his employer
for negligence in causing his work-related injuries. Id. at 545-46. The employer was a non-subscriber to workers' compensation insurance but provided benefits through an employee benefit
plan for employees who elected to participate in the plan. Id. Lawrence, the employee, signed an
election to participate in the employee benefit plan and, as a requirement for participation, waived his
right to recover from the employer for work-related injuries. Id. Following work-related injuries,
Lawrence argued that the election to participate in the employee benefits plan that included the
waiver of his right to sue his employer was void because it violated public policy. Id. Emphasizing
Lawrence's voluntary election between the employer's benefits plan and the employee's right to sue,
the Lawrence court disagreed and held that the Workers' Compensation Act did not establish public
policy prohibiting an otherwise valid pre-injury agreement by which the employee waived common
law rights to sue the employer for negligence in exchange for rights to benefits. Id. ("Absent any
clear indication of legislature intent to prohibit such agreement, we decline to hold them void on
public policy grounds").

 Applying the Lawrence decision, Willoughby and Tamez focus on this voluntary election of
rights distinction and allege that they were not free to decline to sign the releases required by SMT,
and, furthermore, were not provided any benefits by SMT in return for signing the release
agreements. This discernment, however, is inapplicable. The underlying premise of the court's
decision in the Lawrence case was the existence of an employer-employee relationship. See Lawrence,
44 S.W.3d at 544 (applying to actions brought against employers by employees acting in the course
and scope of their employment). As discussed above, neither Willoughby nor Tamez were employees
of SMT, statutory or otherwise; they were employees of Montalvo Trucking and were merely leased
drivers of SMT. As non-employees of SMT, SMT should not be required to provide Willoughby or
Tamez with workers' compensation or any other viable and voluntary alternative. Accordingly, we
overrule this issue on appeal. 

CONCLUSION 

 We overrule all issues, and affirm the judgment of the trial court. 





Karen Angelini, Justice



1. Because Willoughby did not raise this argument to the trial court, however,

 he has waived it on appeal. 
2. Tamez relies on the testimony of Ida Montalvo: "based on my acquaintance with Juan Tamez for more than
five years and my knowledge of his English language capabilities, he could not possibly understand a legal document
as complex as the Release Agreement."
3. Absent proof of mental incapacity, a person who signs a contract is presumed to have read and understood
the contract, unless he was prevented from doing so by trick or artifice. Associated Employers Lloyds v. Howard,294
S.W.2d 706, 708 (Tex. 1956); Indemnity Ins. Co. of N. Am. v. W.L. Macatee & Sons, 101 S.W.2d 553, 556-57 (Tex.
1937). This is true even in cases in which a party to the contract is illiterate. W.L. Macatee & Sons, 101 S.W.2d at 557.

4. In the Release Agreement, "Contractor" refers to Montalvo, Willoughby and Tamez's employer, and
"Carrier" refers to SMT.
5. The provision in the Agreement SMT refers to actually provides: "CONTRACTOR agrees to acquire and
maintain at CONTRACTOR'S expense worker's compensation insurance acceptable to CARRIER, covering all
employees of CONTRACTOR employed for the purpose of furnishing services under the terms of this Agreement . .
.. CONTRACTOR further agrees that any such worker's compensation insurance policy will contain a waiver of
subrogation endorsement, waiving any right of subrogation against CARRIER."
6. Act of Aug. 3, 1956, Pub. L. No. 84-957, 1956 U.S.C.C.A.N. 1163 (current version at 49 U.S.C.A.
§ 14102(a)(4) (1997)). The current version of the statute contains the same requirement, but it is worded a little
differently. It requires carriers to assume full direction and control of the leased vehicles "as if the motor vehicles were
owned by the motor carrier." 49 U.S.C.A. § 14102(a)(4).
7. Although Lawrence was superseded by statute, Lawrence remains the law of those claims, like Tamez's and
Willoughby's, brought by workers who both signed agreements and suffered injury before September 1, 2001. Storage
& Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004).